TOTAL CONTAINMENT, INC., Plaintiff,

v.

ENVIRON PRODUCTS, INC.
and Michael C. Webb,
Defendants.

Civ. A. No. 91–7911.

United States District Court,
E.D. Pennsylvania.

Nov. 3, 1995.

---

George A. Arkwright, Shlesinger, Arkwright & Garvey, Arlington, VA, Charles J. Bloom, Stevens & Lee, P.C., Wayne, PA, David H. Voorhees, James J. Merek, Merek & Voorhees, Alexandria, VA, for Total Containment, Inc.

Arthur H. Seidel, Joseph R. Del Master, Jr., Seidel, Gonda, Lavorgna & Monaco, P.C., Philadelphia, PA, Alan H. Bernstein, Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., Philadelphia, PA, Stanley H. Cohen, Caesar, Rivise, Bernstein, Cohen & Pokotilow, Ltd., Philadelphia, PA, Jeremy T. Ross, Schiffman & Ross, Philadelphia, PA, for Aveda Manufacturing Corp. and Michael C. Webb.

## OPINION

GAWTHROP, District Judge.

### Introduction

#### A. Background

Plaintiff, Total Containment, Inc. ("TCI"), filed this action on December 24, 1991, against defendants, Michael C. Webb and Environ Products, Inc. ("EPI") ("defendant" or "defendants"), for allegedly infringing U.S. Patent 5,040,408 (the '408 patent); U.S. Patent 5,060,509 (the '509 patent); and U.S. Design Patent 322,970 under 35 U.S.C. § 271(a)–(c) by manufacturing, selling, and/or using underground containment sumps. TCI has asserted that the defendants' infringement is willful, thus making this case exceptional within the meaning of 35 U.S.C. § 285, entitling TCI to treble damages and attorneys' fees. TCI has also alleged that Environ's corporate name in-

fringes upon its federally registered trademark "ENVIROFLEX."

The defendants have raised several defenses and asserted several counterclaims. The defendants have alleged that the patents are invalid, void, unenforceable, and not infringed. Mr. Webb has counterclaimed for monetary damages for breach of contract. Environ has also contended that its corporate name does not infringe upon the plaintiff's registered trademark "ENVIROFLEX" because there is no likelihood of confusion.

A sixteen-day bench trial was held. Defendants dismissed with prejudice their counterclaim that the '408 and '509 patents are unenforceable, based on TCI's alleged fraudulent revival of United States Patent Application 07/245,021 after abandonment. Plaintiff TCI, in turn, dismissed with prejudice its claim of infringement of the design patent. Numerous issues were raised at trial, including assignor estoppel, five reexamination requests, one claim canceled on reexamination, numerous claims added on reexamination, assertion of twenty claims against eight allegedly infringing embodiments, and mutual accusations of misconduct before the Patent Office. I shall undertake to treat them in turn.

### B. Findings of Fact

Plaintiff, TCI, is a Delaware corporation with its principal place of business in Oaks, Montgomery County, Pennsylvania. Defendant, EPI, is a Delaware corporation with its principal place of business in Lionville, Chester County, Pennsylvania. Defendant Webb, the sole inventor of the '408 and '509 patents, was employed by TCI as President and General Manager from the early part of 1985 until January 15, 1990. He is now the President and a major stockholder in EPI.

Subterranean piping systems, such as those found at gasoline service stations, are installed and connected to fuel dispensing pumps. These systems pump fuel from storage tanks, generally below ground, to fuel dispensers ("gas pumps"), typically above ground. Leakage from these systems causes environmental pollution of the surrounding soil. Ground-water pollution, fires, and ex-

plosions can also be caused by leaking systems.

Both TCI and EPI are manufacturers of secondary containment systems for underground piping systems. Because federal and state environmental laws require retail gasoline stations to have secondary containment systems, this is a highly lucrative and competitive market. Environmental Protection Agency ("EPA") regulations will require all gasoline service stations to upgrade their underground containment systems by 1998. In 1988, the EPA estimated that the cost of complying with the regulations over the 30-year period ending in 2018 will be about $69 billion, including about $32 billion for component repair, replacements, and upgrades. By one estimate, about 700,000 of the approximately 1.6 million underground petroleum storage tanks and related piping systems subject to these regulations have yet to be upgraded. NT:6:175:5-12.

Underground secondary containment systems include a sealed secondary pipe system, which is installed around the primary pipelines, and a polyethylene containment sump. (See Figure 1. Figures immediately follow page 1418 of this Opinion.)

The sump, which typically surrounds the dispensing pump, is an important part of the secondary containment system. It collects leaking product, provides access for servicing the pump and fittings, and acts as a riser to keep backfill away from the submersible pump and fittings. It is installed at a low point in the dispensing system so that any product that leaks from the system will flow through the secondary piping system and collect in the sump. The sump is sealed to prevent the entry of ground water and to prevent the escape of hazardous fluids and vapors.

On October 1, 1987, Webb filed United States Patent Application 07/103,206, entitled "Secondary Containment System." On October 6, 1988, Webb filed United States Patent Application Number 07/245,021, entitled "Secondary Containment System." This application was a continuation-in-part of United States Patent Application 07/103,206.

In May, 1989, Rodney Brancher resigned from Remcom Plastics, a manufacturer of sumps for TCI through the process of rotational molding, and created Aveda Corporation. Because Brancher lacked the resources to obtain bank financing to purchase the equipment required for rotational molding, TCI established a $100,000 line of credit for Aveda. Aveda and Brancher were required to execute various security agreements and guaranties in TCI's favor. Aveda began operations in July, 1989.

On May 8, 1989, Webb filed United States Patent Application 07/348,396 as a divisional application of United States Patent Application 07/254,021.

On July 1, 1989, a one-year employment agreement between Webb and TCI became effective. On January 15, 1990, Webb and Anthony Paladinetti, Jr., Vice President of Operations, left TCI. About January 31, 1990, TCI tendered Webb a proposed settlement agreement. On March 9, 1990, Webb entered into the post-termination settlement agreement (the "Settlement Agreement"). Webb assigned all rights in United States Patent Application 07/254,021 to TCI.

On April 16, 1990, at the request of Brancher, Webb loaned Aveda $60,000. The line of credit established for Aveda by TCI in 1989 was retired.

About May 20, 1990, TCI terminated its business relationship with Aveda. In May of 1990 TCI terminated Michael S. Gurnicz, its Vice–President of Marketing. On June 29, 1990, Brancher, Gurnicz, and Paladinetti advised TCI, though counsel, of the formation of Environ Products, Inc., which was to manufacture and sell tank sumps.

On July 24, 1990, TCI brought suit against Aveda, Environ, Brancher, Gurnicz, Paladinetti, and Webb in the United States District Court for the Eastern District of Pennsylvania (Civil Action 90–4788) alleging, among other things, breach of contract, theft of trade secrets, infringement of the '970 patent, and numerous RICO violations. Rescission of the settlement agreement with Webb was requested.

On July 25, 1990, Webb advised TCI, through counsel, that the action constituted a breach of the mutual release provisions contained in the settlement agreement, excusing Webb of any further obligation under the agreement.

On October 1, 1990, TCI brought suit against Aveda, Environ, Brancher, Gurnicz, Paladinetti, and Webb in the Chester County, Pennsylvania, Court of Common Pleas (Civil Action 90–08520) alleging, among other things, fraud and breach of contract. Rescission of the settlement agreement with Webb was sought.

On November 13, 1990, TCI filed United States Patent Application 07/611,435 as a divisional application of United States Patent Application 07/254,021.

On January 15, 1991, the Patent and Trademark Office ("PTO") granted TCI Trademark Registration 1,631,610, for "ENVIROFLEX," as a trademark for "plastic and rubber pipes for conveying gasoline, diesel fuel and chemicals."

On May 1, 1991, the federal action was dismissed without prejudice, conditioned upon TCI's paying the defendants' attorneys' fees. *Total Containment, Inc. v. Aveda Manufacturing Corp.*, 1991 WL 75192 (E.D.Pa.1991).

On August 20, 1991, United States Patent Application 07/348,396 issued as United States Patent 5,040,408 (the '408 Patent). On October 29, 1991, United States Patent Application 07/611,435 issued as United States Patent 5,060,509 (the '509 patent). The '509 patent bears a terminal disclaimer disclaiming the portion of the patent term after August 20, 2008, the expiration date of the '408 patent. Except for the initial paragraph, which cross-references related applications, and the claims, the two patents are identical.

On December 24, 1991, this action was filed. On May 15, 1992, this court granted plaintiff's request for a preliminary injunction against the defendants. *Total Containment Inc. v. Environ Products Inc.*, 23 U.S.P.Q.2d 1305, 1992 WL 111364 (E.D.Pa. 1992).

On April 14, 1993, EPI filed reexamination requests 90/003,029 and 90/003,030 for reex-

amination of the '408 and '509 patents, respectively. On June 7, 1993, the PTO granted the requests for reexamination of the '408 and '509 patents.

On July 15, 1993, EPI filed reexamination request 90/003,127, its second request for reexamination of the '408 patent. On March 10, 1994, EPI filed its third request for reexamination of the '408 patent, and its second request for reexamination of the '509 patent.

On April 19, 1994, the United States Patent Office issued Reexamination Certificate B1 5,040,408. Claim 1 was determined to be patentable as amended. Claim 2, dependent on amended claim 1, was determined to be patentable. The patentability of claims 3–12 was confirmed. New claims 13–19 were added and determined to be patentable.

On May 18, 1994, the PTO denied reexamination requests of March 10, 1994. PX 135.

On June 14, 1994, this court held that the doctrine of assignor estoppel prevented the defendants from attacking the '408 and '509 patents on the basis of prior art and obviousness. *Total Containment Inc. v. Environ Products Inc.*, 33 U.S.P.Q.2d 1316, 1994 WL 470172 (E.D.Pa.1994).

On September 7, 1994, TCI's counsel submitted additional information to the PTO for its consideration in reexamination of the '509 patent. PX 136(a). On September 20, 1994, the PTO issued Reexamination Certificate B1 5,060,509. Claims 1 and 10 were canceled. Claims 2, 5, 7 and 8 were determined to be patentable as amended. Claims 3, 4, 6, and 9, dependent on amended claims, were determined to be patentable. New claims 11–19 were added and determined to be patentable.

## Discussion

### A. Jurisdiction and Venue

This court has jurisdiction over the patent infringement claim under 28 U.S.C. § 1338(a) and over the trademark claim under 15 U.S.C. § 1121(a). This court has pendent jurisdiction over the contract counterclaim under 28 U.S.C. § 1338(b). *Kunkel v. Topmaster Int'l, Inc.*, 906 F.2d 693 (Fed.Cir. 1990). Venue is proper in this district under 28 U.S.C. § 1400(b).

### B. Inequitable Conduct

#### 1. Defendant's Allegations

Patent validity is not an issue in this case. In a memorandum dated June 14, 1994, this court held that the doctrine of assignor estoppel prevented the defendants from attacking the patents in suit on the basis of prior art and obviousness. *Total Containment*, 33 U.S.P.Q.2d at 1316. Thus, in this action the defendants cannot attack the validity of the asserted patents by claiming that the '021 application (filed Oct. 6, 1988)—the parent application of the applications that matured into the '408 and '509 patents—is not entitled to the filing date of the earlier '206 application (filed Oct. 1, 1987), and that on-sale activity that the defendants allege occurred before October 6, 1987, is a statutory bar to patentability under 35 U.S.C. § 102(b). Although barred from raising these issues to attack the validity of the asserted patents, they raise the same issues in a different context: inequitable conduct. Defendants allege that TCI engaged in inequitable conduct during reexamination of the '408 and '509 patents, based on the following facts. In May 1993, TCI's counsel received a copy of a document entitled "Secondary Containment for Underground Piping" (the "Bigbee Steel document"). The Bigbee Steel document (DX–203D) is a fax of a document that purports to be an undated TCI brochure describing and illustrating secondary containment systems. Page three of this document describes "Sump/Risers" and illustrates them with a drawing similar to Figure 3 of the '408 and '509 patents. One of the illustrations has a number of horizontal lines across the sump riser. Across the top of this document is a fax burn-in reading: "09/10/87 14:48 Bigbee Steel & Tank Co." EPI argues that this burn-in proclaims the date, time, and origin of the fax.

The PTO indicated that the claims that recite "score lines" (claim 12 of the '408 patent, claim 7 of the '509 patent, and various claims that were added during reexamination) were not entitled to a filing date of October 1, 1987, the filing date of the initial application, but only to a filing date October 6, 1988, the filing date of the continuation-in-

part application.[1] EPI alleges that this document is evidence that sump risers containing score lines were offered for sale more than one year before October 6, 1988. Therefore, claims that recite score lines are barred by 35 U.S.C. § 102(b) (an "on-sale bar"). Defendant alleges that plaintiff's counsel committed inequitable conduct by not investigating this document and bringing it to the attention of the PTO during reexamination of the '408 and '509 patents.

In January, 1994, TCI filed a complaint for patent infringement against Buffalo Environmental Products in the Eastern District of Virginia. A trial was held in July, 1994 (the "Virginia trial"). EPI alleges that certain testimony by TCI's officers during this trial constituted an admission of on-sale activity during July and August, 1987. Defendant claims that TCI's counsel committed inequitable conduct by not bringing these alleged admissions to the attention of the PTO during reexamination of the '509 patent.[2]

2. Legal Standard

▇▇▇ Applicants for patents have an "uncompromising duty" to prosecute patent applications in the PTO with candor and good faith. *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945). This duty extends to the applicant's representatives. *FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1415 n. 8 (Fed.Cir.1987); *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995). A breach of this duty constitutes inequitable conduct.

▇▇▇ If the applicant fails to observe its duty of candor in its dealings with the PTO, all claims of resulting patent are rendered unenforceable. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 872 (Fed.Cir.1988); *LaBounty Mfg., Inc. v. United States Int'l. Trade Comm'n,* 958 F.2d 1066, 1070 (Fed.Cir.1992). Inequitable conduct in a second prosecution of the claims of an earlier-issued patent renders all the claims unenforceable. *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 882 F.2d 1556, 1563 (Fed.Cir.1989).

▇▇▇ Inequitable conduct includes an affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. *See J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). The party alleging inequitable conduct "must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of the prior art and its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO." *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995); *see also N.V. Akzo v. E.I. du Pont de Nemours & Co.,* 810 F.2d 1148 (Fed.Cir.1987). A finding of inequitable conduct requires a finding of both materiality and intent to mislead.

The doctrine of inequitable conduct requires a trial court to undertake a two-step analysis. The trial court must discern whether the withheld references satisfy a threshold level of materiality. The court must also determine whether the applicant's conduct satisfies a threshold showing of intent to mislead.... Next, assuming satisfaction of the thresholds, the trial

---

1. Any sales of products that incorporated features of the patented invention that occurred before October 1, 1987—if in fact such sales did occur—are only *material to an on-sale bar if* the '021 application is not entitled to the filing date of the '206 application. In an opinion issued by Judge Hilton of the Eastern District of Virginia, the court held that the '021 application was entitled to the filing date of the earlier application. *Total Containment, Inc. v. Buffalo Environmental Products Corp.,* 94–30A, slip op. at 15, 1995 WL 454143 (E.D.Va.1995). The Virginia court found the '408 patents to be valid and enforceable. *Id.* at 24. Because I have found that the allegedly withheld information is not

material to reexamination, it is unnecessary to address this issue here.

2. The '509 patent was the only patent still undergoing reexamination in July, 1994. The reexamination certificate for the '408 patent issued on April 19, 1994. The reexamination certificate for the '509 patent did not issue until Sept. 20, 1994. TCI was not required to respond to the additional reexamination request for the '408 patent filed on March 10, 1994, because the PTO determined that the information submitted by EPI did not raise a substantial new question of patentability affecting any claim of the patent.

court must balance materiality and intent. The more material the omission, the less culpable the intent required, and vice versa. The trial court has discretion to determine inequitable conduct.

*Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 1439 (Fed.Cir.1991) (internal citations omitted). Both intent and materiality must be proven by clear and convincing evidence. *Braun, Inc. v. Dynamics Corp. of America,* 975 F.2d 815, 822 (Fed.Cir. 1992).

> Intent to deceive should be determined in light of the realities of patent practice, and not as a matter of strict liability whatever the nature of the action before the PTO. A patentee's oversights are easily magnified out of proportion by one accused of infringement. Given the ease of which a relatively routine act of patent prosecution can be portrayed as intended to deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required.

*Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 939 (Fed.Cir.1990) (internal citations omitted).

### 3. The Bigbee Steel Document

■ As a threshold issue, the court must first consider whether the Bigbee Steel document is admissible evidence. Under the Federal Rules of Evidence, any written assertion offered to prove the truth of the matter asserted, other than one made by the declarant while testifying, is hearsay. Fed. R.Evid. 801(c). Hearsay is inadmissible unless it falls under an exception to the hearsay rule. Fed.R.Evid. 802. Federal Rule of Evidence 803, which sets forth the exceptions to the Hearsay Rule, provides that a "statement not specifically covered by any of the foregoing exceptions, but having equivalent circumstantial guarantees of trustworthiness, may under certain circumstances be admitted . . ." Fed.R.Evid.Rule 803(24).

As the proponents of this document, the defendants bear the burden of establishing its admissibility.[3] Defendants have not of-

fered any circumstantial guarantees of trustworthiness for the fax burn-in. Neither the sender nor the recipient of the fax has been identified. No phone records—assuming this was a long-distance fax—that correlate with the alleged time and date of the fax have been introduced. Absent any such circumstantial guarantees, I conclude that the fax burn-in is insufficiently trustworthy, in and of itself, to be admissible to establish the date of this document. *Compare Select Creations, Inc. v. Paliafito America, Inc.,* 830 F.Supp. 1223, 1239 (E.D.Wis.1993) (fax inadmissible where the proponent neither established the identity of the individual who allegedly sent the document nor offered evidence that the fax was the document allegedly received) *with People v. Hagan,* 145 Ill.2d 287, 164 Ill.Dec. 578, 588, 583 N.E.2d 494, 504 (1991) (admission of fax was proper where there was testimony as to how the fax was sent and received, and the fax machine operator and addressee identified the fax). *See also Tyson v. State,* 873 S.W.2d 53, 61 (Tex.Ct.App.1993) (a fax transmission is a "telephone conversation" and is authenticated as set forth in Tex.R.Crim.Evid.Rule 901(b)(6), which is identical with Fed.R.Evid. Rule 901(b)(6)).

### 4. The Alleged Admissions

■ EPI alleges that certain testimony by TCI's officers during the Virginia trial constituted admissions of on-sale activity occurring in July and August of 1987. It further claims that TCI's counsel committed inequitable conduct by not bringing these alleged admissions to the attention of the PTO during reexamination of the '509 patent.

The use of admissions in reexaminations is described in the Manual of Patent Examining Procedure ("MPEP"), which contains instructions examiners are required or authorized to follow in the normal examination of patent applications.

> The consideration under 35 U.S.C. § 303 of a request for reexamination is limited to prior patents and printed publications. Thus an admission per se may not be the

---

**3.** Apparently, a fax burn-in can be rather easily faked. The time and date printed by the machine can be changed merely by resetting the machine. Alternatively, the burn-in from one document can be photocopied onto another document with an office copier.

basis for establishing a substantial new question of patentability. However, an admission by the patent owner of record in the file or in a court record may be utilized in combination with a patent or printed publication.

MPEP § 2216 (Rev. 14, Nov. 1992).

It is undisputed that TCI sold secondary containment systems before October 6, 1987. Whether these systems contained score lines and access lids, features of the patented invention, is a disputed question of fact. The defendants bear the burden of proving public use or sale by clear and convincing evidence. *Dunlop Co. v. Kelsey–Hayes,* 484 F.2d 407, 413 (6th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974). The evidence consists of price lists, brochures, and the testimony of various witnesses testifying from memory as to what was being sold eight years ago. Many of the price lists and brochures are undated; frequently the detailed nature of the product cannot be determined from the description given in the document; and the witness are unsure as to exactly what was introduced when.

Defendant's witness, Michael Nolan, who was Vice–President of TCI from 1986 to 1989, and is now employed by a third party not involved in this action, explained the problem in his testimony. "[T]his was eight years ago and when you are in a fast-moving business with new product development like we are in, you have to flush out what is irrelevant and as far as I'm concerned, [the date that a particular product was brought onto the market] was." NT–16:85:25–86:3. Striking a similar note, defendant's patent counsel testified that, "I think any organization would have difficulty in going back seven or eight or nine years and locating records."[4] NT–15:106:9–11.

The court finds that the defendants have not met their burden of proof. They have not offered clear and convincing evidence that public use or sale of sumps with features of the patented invention were made before October 6, 1987. Nor have they offered clear and convincing evidence that testimony at the Virginia trial constituted admissions that such sales were made.

Defendants' allegations also fail because the information was submitted to the PTO. On September 7, 1994, while the reexamination of the '509 patent was still pending, TCI's counsel submitted the Bigbee Steel document and the trial transcripts of the Virginia trial to the PTO. PX 136(a). On December 29, 1994, in the middle of this trial, the PTO returned the information to plaintiff's counsel. A cover letter headed "Decision Returning Improper Paper" and signed by Nicholas P. Godici, Director of Examining Group 2600 stated:

> [T]he paper with accompanying exhibits is an improper submission under 35 USC 301 and likewise under 37 CFR § 1.501 because it is not limited to the submission of prior art patents and printed publications and is being returned herewith. The comments and exhibits concerning litigation and the public use, on sale issue are clearly not explanations of the pertinency or the manner of applying any prior art to at least one claim of the patent. It is also noted that public use and on sale issues are not appropriate for reexamination.

*Id.*

Defendant argues that this submission was inadequate because it only told the PTO there were *allegations* of an on-sale bar, but did not disclose the *facts* regarding an on-sale bar. The plaintiff has consistently de-

---

**4.** Defendants' patent counsel, technical expert, and expert on inequitable conduct, testified at trial that, in his opinion, the plaintiff's attorney had committed inequitable conduct during the reexamination. He also testified that, in his opinion, the "uncompromising duty" of *Precision Instrument* did not cease when reexamination proceedings ended, but was unable to cite any authority support his opinion. NT–15:130:6–132:4. He was unsure as to whether reexaminations were governed by 37 C.F.R. § 1.56 or 37 C.F.R. § 1.555 and had some difficulty recalling

the attributes of a "printed publication." NT–15:111:15–112:6; N T–15–93:22–94:9; NT–16–28:2–29:4. Because of his apparent difficulty in recalling the basic principles that govern patent prosecution, I accord little weight to his testimony.

Arthur H. Seidel and Joseph R. DelMaster, Jr., defendants' trial counsel, did not enter an appearance of defendants' behalf until April 28, 1994. They apparently were not involved in the reexamination proceedings.

nied that any such sales were made. The defendants bear the burden of proving their allegations by clear and convincing evidence. They have failed so to do.

### 5. Materiality

■ The case at bar is readily distinguishable from *Precision Instrument.* In *Precision Instrument* evidence of false dates intended to antedate a reference came to counsel's attention during an interference proceeding involving an application that matured into the patent in suit. *Precision Instrument,* 324 U.S. at 808, 65 S.Ct. at 994. In the case at bar plaintiff's counsel received information of alleged possible on-sale activity while a request for reexamination was pending.

In May, 1993, both the '408 and '509 patents were issued patents. EPI requested reexamination of both patents in April, 1993; the PTO granted the request in June, 1993. TCI's counsel received the Bigbee Steel document during an interference proceeding that did not involve an application that matured in either the '408 or '509 patents. The proceeding concerned an unrelated application, which matured in United States Patent 4,971,477, a patent not involved in this action.

As the party who alleges inequitable conduct arising from a failure to disclose information to the PTO, EPI must offer clear and convincing evidence of the materiality of the information. *Molins,* 48 F.3d at 1178; *FMC,* 835 F.2d at 1415. The information that the

PTO may consider during reexamination is limited by statute to "prior art consisting of patents and printed publications." [5] 35 U.S.C. §§ 301–302. The Rules of Practice state that in requesting reexamination "any person may cite to the Patent and Trademark Office in writing prior art consisting of patents or printed publications...." 37 C.F.R. § 1.501. Patents "will be reexamined in the basis of patents and printed publications." [6] 37 C.F.R. § 1.552(a). Other questions will not be resolved during reexamination proceedings. 37 C.F.R. § 1.552(c). The MPEP states that "[r]ejections on prior art in reexamination proceedings may only be made on the basis of prior patents or printed publications." MPEP § 2258.

> Rejections will not be based on matters other than patents or printed publications, such as public use or sale, inventorship. 35 U.S.C. 101, fraud, etc. *A rejection on prior use or sale,* insufficiency of disclosure, etc, *cannot be made even if it relies upon a prior patent or printed publication.*

*Id.* (internal citations omitted) (emphasis added). Because the PTO is prevented both by statute and by its own rules and regulations from considering evidence of on-sale activity, even if it relies on a patent or a printed publication, the Bigbee Steel document is not material to the reexamination of the '408 and '509 patents.

The language of 37 C.F.R. § 1.555(b)(2) does not contain an explicit limitation to patents and printed publications. [7] However, re-

---

**5.** 35 U.S.C. § 302 provides in relevant part that "[a]ny person at any time may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of section § 301 of this title." 35 U.S.C. 301 provides in relevant part that "[a]ny person at any time may cite to the Office in writing *prior art consisting of patents or printed publications* which that person believes to have a have a bearing on the patentability of any claim of a particular patent." (Emphasis added.).

**6.** 37 CFR § 1.552 Scope of Reexamination Proceedings

(a) Patent claims will be reexamined on the basis of patents or printed publications.

(b) Amended or new claims presented during reexamination proceedings must not enlarge the scope of the claims of the patent and will be examined on the basis of patents or printed pub-

lications and also for compliance with the requirements of 35 U.S.C. § 112 and the new matter prohibition of 35 U.S.C. § 132.

(c) Questions other than those indicated in paragraphs (a) and (b) of this section will not be resolved during reexamination proceedings. If such questions are discovered during a reexamination proceeding, the existence of such questions will be noted by the examiner in an Office action, in which case the patent owner may desire to consider the advisability of filing a reissue application to have such questions considered and resolved.

**7.** "Information is material when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application as a patent." *Molins,* 48 F.3d at 1179. The Federal Circuit has adopted this standard as the threshold standard for materiality. *Id.,* n. 8.

examination proceedings are subject to the limitations of 35 U.S.C. §§ 301–302, which limits reexamination to patents and printed publications. The regulation is subordinate to the statute. Failure to recite the statutory limitation in the regulation cannot remove the limitation.

In Section 2216, the MPEP states that "an admission by the patent owner of record in the file or in a court record may be utilized in combination with a patent or printed publication". Defendants rely on this statement for the proposition that the PTO will consider admissions of prior sales during reexamination proceedings. Decisions by the Board of Patent Appeals and Interferences are not consistent with this interpretation. In *Ex parte McGaughey*, 6 U.S.P.Q.2d 1334 (Bd. Pat.App. & Int.1988), an expanded panel of the Board that included then-Commissioner Quigg held that an admission of prior are *set forth in the patent undergoing reexamination* could be considered during reexamination. In response to a dissent that argued that the Board had exceeded its statutory authority, the majority emphasized the limited scope of its holding:

> This is not to say that the Office has been willing to open reexamination to any type of evidence that is available to the examiner during initial examination. The Commissioner has construed section 305 conservatively. Facts, including admissions which have already been established in the record, have been authorized for use in reexamination proceedings. *The PTO has not authorized other types of evidence such as on-sale bars, public use issues or issues relating to fraud.* Thus, the implication by the dissent that this decision will result in such issues being authorized in unfounded.

This standard is based on a version of 37 C.F.R. § 1.56 that was in effect from 1977 to 1992. In 1992 the PTO adopted new rules that apply to all applicants and reexamination proceedings pending or filed after March 16, 1992. The reexamination proceedings for the '408 and '509 applications were governed by a new version of 37 C.F.R. § 1.555(b).

> Under this section, information is material to patentability in a reexamination proceeding when it is not cumulative to information of record or being made of record in the reexamination proceeding, and

*Ex parte McGaughey*, 6 U.S.P.Q.2d at 1338 (emphasis added) (internal citation omitted).

The Board has held that *McGaughey* is limited to prior art established in the patent record by unequivocal admissions. "The issue resolved in *McGaughey* was *confined* to whether prior art *established* in the *patent record* by an unequivocal admission may be relied upon to support a rejection during a reexamination proceeding involving that patent." *Ex parte Natale*, 11 U.S.P.Q.2d 1222, 1224–1225 (Bd.Pat.App. & Int.1989) (emphasis in original). Consequently, "the examiner has no authority to engage in a fact-finding endeavor to establish the existence of a public use under 35 U.S.C. § 102(b) during a reexamination proceeding." *Id.* at 1226.

In *Natale* the plaintiff vigorously denied that there was on-sale activity that constituted prior art under 35 U.S.C. § 102(b). The examiner attempted to piece together language extracted from litigation-related documents to establish prior art. The Board found that "[b]y no stretch of the imagination can the evidence relied upon by the examiner be considered to establish prior art under 35 U.S.C. § 102(b) by an unequivocal admission." *Id.* at 1225.

Whether the holding of *McGaughey* should be extended "to permit reliance upon prior art established by admissions during a reexamination proceeding and prior art established by admissions in external court proceedings" was not addressed by the Board in *Natale*. Because the Board found that the evidence relied upon by the examiner was not an unequivocal admission, it did not have to address this issue. *Id.* at 1225.

Here, as in *Natale*, the plaintiff vigorously denies that there was on-sale activity that

> (1) It is a patent or a printed publication that establishes, by itself or in combination with other patents or printed publications, a prima facie case of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with, a position the patent owner takes in:
>
> (i) Opposing an argument of unpatentability relied on by the Office, or
>
> (ii) Asserting an argument of patentability.
>
> 37 C.F.R. 1.555(b). The Federal Circuit has not yet commented on the meaning the new rules. *See Molins*, 48 F.3d at 1179, n. 8.

constitutes prior art under 35 U.S.C. § 102(b). Thus, the testimony cannot be considered to be an unequivocal admission. Consequently, under *Natale,* the examiner is prohibited from considering the information that the defendant alleges was improperly withheld.

But there is even stronger evidence available that the PTO will not consider the information that the defendants' claim was improperly withheld from the PTO. The information was submitted to the PTO, but the PTO rejected it with an unequivocal statement that "public use and on sale issues are not appropriate for reexamination."

The Patent Office is an administrative agency to which Congress has delegated its constitutionally granted power to issue patents. In the exercise of its duties, the PTO has made regulations and established procedures that carry out its mandate, under 35 U.S.C. §§ 301–302, that only "prior art consisting of patents and printed publications" may be considered during reexamination. Acting in accordance with these regulations and procedures, the PTO returned the plaintiff's submission with a statement that "public use and on sale issues are not appropriate for reexamination."

Simply put, the defendants' assertion— that the information returned to the plaintiff by the PTO is material to reexamination—is an assertion that the PTO's rules and regulations do not properly interpret the law. For this court to find that the plaintiff committed inequitable conduct, it would not only have to find that the PTO's rules and regulations do not properly interpret the law, but that the plaintiff was aware the PTO's interpretation was incorrect. Thus, the "uncompromising duty" of *Precision Instrument* required it to demand that the PTO consider the submitted information and perhaps even required it to bring suit against the PTO to compel it to do so. The court declines to hold that the "uncompromising duty" of *Precision Instrument* requires such actions.

"An agency's interpretation of its own regulations should be accepted by the courts unless it is shown to be unreasonable or inconsistent with statutory authority." *Fair-*

*fax Nursing Center v. Califano,* 590 F.2d 1297, 1301 (4th Cir.1979).

The defendant has not provided any compelling reasons for finding that the PTO's regulations and procedures are unreasonable or inconsistent with statutory authority. I find that the information submitted by the plaintiff was properly rejected by the PTO as "inappropriate" and, therefore, is not material to the reexamination.

6. Intent

A finding of inequitable conduct requires a finding of both materiality and intent. *Molins,* 48 F.3d at 1178. "Absent materiality, inequitable conduct for failure to disclose cannot lie." *Northern Telecom,* 908 F.2d at 940. Because the court has found that none of the allegedly withheld information was material to the reexamination proceedings, consideration of the intent prong is unnecessary. However, in the interest of ultimate judicial economy the court will address this issue. Should it be determined on appeal that the allegedly withheld information was material to reexamination, there will be no need for a remand because the court has already addressed the question of intent.

Clear and convincing evidence is required to support an inference of culpable intent. *Id.* at 939. The information that the defendant alleges was withheld was submitted during reexamination of the '509 patent. Consequently, there was no intent to deceive the PTO by withholding this information.

That the plaintiff chose not to apply for reissue cannot be taken as evidence of intent to deceive. In a 1988 opinion written by then-Chief Judge Markey, the Federal Circuit forcefully rejected this argument:

> [A] suggestion that patentees should abandon their suits, or disclaim or reissue, in response to every charge of inequitable conduct raised by an alleged infringer would be nothing short of ridiculous. The right of patentees to resist such charges must not be chilled to extinction by fear that a failure to disclaim or reissue will be used against them as evidence that their original intent was deceitful.... A requirement for disclaimer or reissue to

avoid adverse inferences would merely encourage the present proliferation of inequitable conduct charges.

*Kingsdown Medical,* 863 F.2d at 875. This court finds that the defendant has failed to establish intent by clear and convincing evidence.

### 7. Defendant's Conduct During Reexamination

■ Although the plaintiff's counsel did not withhold material information from the PTO during reexamination of the '408 and '509 patents, the same cannot be said for the defendant. The facts are not in dispute. On April 14, 1993, EPI filed reexamination request 09/003,030 with the PTO for reexamination of the '509.[8] Exhibit 18 of this was an undated brochure entitled "Instructions for the Installation of Hofit Chambers" (the "Hofit brochure") published by Hofit, a kibbutz located in the Jordan Valley of Israel. Across the bottom of the brochure was printed "Hofit, Kvutsat Kinneret, Jordan Valley, Israel. Tel: 06–759530/1/2, Fax: 06–75918." Exhibit B of this submission was a declaration signed by one E. Friedler, export manager of Hofit Plastic Products, indicating that the attached brochure "was published and distributed by HOFIT in 1980 on a nonconfidential basis without restriction as to redistribution." In its request, defendant made the following representation:

> Another prior art document which is submitted herewith is a printed publication identified herein as the HOFIT PRINTED PUBLICATION. Enclosed herewith as EXHIBIT B is a Declaration by an employee of HOFIT which sets forth the circumstances authenticating the HOFIT PRINTED PUBLICATION as being available in 1980, which is one year earlier than the earliest date to which the '509 PATENT would be entitled.

Reexamination File history of U.S. Patent 5,040,509, at 4. The PTO granted the request for reexamination on June 7, 1993. *Id.* at 151. An office action was mailed on July 19, 1993, rejecting all claims the '408 patent. *Id.* at 220.

Plaintiff's attorney responded on August 4, 1993. Included in this response were translations from the 1990 and the 1993 editions of "Golden Pages Kibbutzim Directory," Israeli telephone directories which plaintiff's attorney had examined in the Library of Congress. These directories indicated that the telephone number on the brochure was Hofit's number in 1993, but that Hofit's telephone number was different in 1990. *Id.* at 50–52.[9] In an Office Action dated August 31, 1993, the PTO concluded that the Hofit brochure was not available as prior art under 35 U.S.C. § 102. *Id.* at 517.

While reexamination was pending, defendant received the following letter, dated October 29, 1993, from one Daniel Peremen, an EPI sales agent in Israel.

> Further to your letter 10/14/1993, I visited yesterday the Hofit factory and met Mr. F[r]iedler and Mr. Stein—sales manager.

> The Hofit factory is located near the Sea of Galilee and belongs to a kib[b]utz—a cooperative commune, unique to Israel, in which the members share all the property and all the labor. Most of the workers are rotated every few years to other jobs in the kib[b]utz and therefore it is very difficult to reconstruct information related to 1980 or even 1986.

> Mr. F[r]iedler was very cooperative and spent a long time with me, searching through all the old files and records, but unfortunately all the records prior to 1987–1988 have been destroyed and it was impossible to find exact information on trade shows and correspondence with customers abroad, prior to those years.

> We succeeded to find some old brochures, which we are sending to you, to-

---

8. Only the proceedings for the '509 patent will be described. With the exception of the second reexamination request for the '408 patent, submitted on July 15, 1993, the relevant information for reexamination for both patents is essentially the same. The PTO granted the second reexamination request for the '408 patent on September 15, 1993. Proceedings were merged on September 30, 1993. Reexamination File History for U.S. Patent 5,040,408, at 365.

9. Some of the documents in the reexamination file history are out of chronological order.

gether with the declarations signed by Mr. Friedler. He left it to you to fill in the blanks.

It is impossible to identify the year in which the brochures were printed. However we can have some indication from the phone numbers specified in it. The phone numbers of Hofit were changed two times: Around 1986, the area code was changed from 067 to 06 (the 7 was added to the number) Therefore all brochures carrying phone number 067–56731/2 are prior to 1986/87. All brochures with 06–756731/2 were printed later. In 1993, the phone number was changed again to 06–759530/1/2.

PX 129.[10] None of the information contained in this letter was transmitted to the PTO.[11]

On March 10, 1994, additional reexamination requests were submitted to the PTO. Copies of earlier Hofit brochures, some of which were in the files of the Association of Rotational Molders ("ARM"), a trade association located in Chicago, Illinois, were submitted to the PTO. Defendant made the following representation in this request: "Note specifically, the HOFIT PRINTED PUBLICATIONS that were received in June, 1985, by the Association of Rotational Molders (ARM) as shown by the date stamp on the Application by HOFIT." Reexamination request 90/003,355 at 3. "Several of the HOFIT PRINTED PUBLICATIONS bearing 067–56731–2 were received on or about June

21, 1985, sufficiently early to be an effective reference against the '509 PATENT and its critical date of October 1, 1987." *Id.* at 4. "The ARM file clearly documents the receipt by that organization of the HOFIT PRINTED PUBLICATIONS enclosed therein in June, 1985." *Id.* at 5. Because the defendant wanted to use the telephone numbers to establish the publication dates for these earlier brochures, a declaration signed by Peremen explaining the relevance of the telephone numbers was included in this submission. An affidavit from Friedler was also included.

At the time these representations were made to the PTO, EPI was aware of two facts that were not made known to the PTO: (1) ARM did not date-stamp its documents, so the date the documents had been received by ARM could not be determined, and (2) written authorization from Friedler had been required before ARM would release the Hofit file. NT–16:23:1–29:4. Thus, EPI knew there was nothing in the ARM file to support its representation that the ARM file clearly documented that ARM had received the brochures on or about June 1985. It was also aware that the brochures in the ARM file might not have been "publicly accessible" and thus might not qualify as printed publications under 35 U.S.C. § 102(b). *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1568 (Fed.Cir.1988), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218

---

**10.** As the requestor, EPI received copies of all office actions and of all the papers filed by TCI with the PTO during reexamination. 37 C.F.R. § 1.550(e). Thus, the defendants were aware of the discrepancy in telephone numbers and the PTO's response when they received the Peremen letter. TCI did not receive the Peremen letter until May 11, 1994, when it was ruled that the letter was not a privileged communication between a client and an attorney and plaintiff's motion to compel discovery was granted.

Mr. Peremen and Mr. Friedler are residents of Israel and did not personally appear at trial. Mr. Friedler was deposed in Tel Aviv, Israel, on May 12, 1994, in connection with the Virginia trial. His deposition was entered into evidence in this action. DX–277.

**11.** There does not appear to be any authority that holds that a third-party reexamination requestor is required to disclose to the PTO information discovered subsequent to the reexamination request that refutes or is inconsistent with a posi-

tion the requestor has taken in the reexamination request. According to the regulations, the active participation of the requestor ends once reexamination has been ordered and "no further submissions on behalf of the reexamination requester will be acknowledged or considered." 37 C.F.R. § 1.550(e). Any further submission must be submitted as part of new reexamination request. *Id.*

Literally, this regulation means that the PTO will not consider any further submissions from the requestor once reexamination has begun. Apparently, even a good-faith attempt to correct misinformation inadvertently supplied with the reexamination request will not be acknowledged or considered. Reexamination will proceed on the basis of incorrect information, even though the PTO had been supplied with the correct information. Thus, the correct information would not be material because the PTO would not consider it.

(1988). These facts were not given to the PTO.

■ The publication date of a printed publication determines whether it is prior art to the claims undergoing reexamination. 35 U.S.C. § 102(b); *Constant,* 848 F.2d at 1568. Dissemination and public accessibility are the keys to the legal determination whether a prior art reference was "published." *Id.* Any information that would help to establish the publication date or the dissemination and public accessibility of an alleged printed publication is material to the reexamination. Thus, the withheld information was material to the reexamination proceedings.

Defendants' patent counsel conceded at trial that he had an "uncompromising duty" during the reexamination proceedings, and that he was aware of the withheld information. NT–15:89:20–23. This is a patent attorney with over thirty-five years experience in the preparation and prosecution of patent applications, who deals with the PTO "on a daily and weekly basis." NT–15:78:11–13. He was certified to this court an expert witness on inequitable conduct and testified extensively how those who have matters pending before the PTO have an "uncompromising duty" to submit all facts relevant to such matters to the PTO. He knew or should have known of the materiality of the withheld information.

Intent to mislead is rarely admitted or obvious. It must be inferred in most cases from surrounding circumstances. *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,* 984 F.2d 1182, 1191 (Fed.Cir.1993). At the time of the defendant filed the reexamination requests, the '408 and '509 patents

had been asserted against it in this action. Defendant's obvious objective was to have the PTO cancel the claims of the '408 and '509 patents, thus mooting this action.

Defendant's patent counsel stated at trial that he had relied on the Friedler declaration in making his representations to the PTO that ARM had received the Hofit brochures on or about June 21, 1985. Friedler is a resident of Israel. ARM is located in Chicago. There is no evidence that Friedler had personal knowledge of the ARM files. Friedler's declaration does not represent that the brochures had been received by ARM before Oct. 1, 1987.[12] Counsel also knew that ARM did not date-stamp its documents.

From these circumstances, intent to mislead can be inferred. Consequently, the court finds that during the reexamination proceedings the defendant withheld material information from the PTO, that the information was known to defendant, that defendant's counsel knew or should have known the information was material to the reexamination proceedings, and that the information was withheld with the intent to mislead the PTO.

A third-party reexamination requestor is apparently not expressly required to exercise candor and good faith in its dealing with the PTO. 37 C.F.R. § 1.555(a), which deals with information material to patentability in reexamination proceedings, only applies to the patent owner and those associated with it.[13] Although the defendant's conduct during the reexamination proceedings does not conform with the duty of candor and good faith, there

---

12. Friedler made the following statements about ARM in his declaration.

> On June 6, 1985, I signed an application for membership in the Association of Rotational Molders (ARM) and submitted the same to that organization. Accompanying that application was a HOFIT printed publication, printed in Hebrew and English, hereinafter HOFIT I. This HOFIT I printed publication bears the telephone number from 1980–1988 and the same telephone number that I placed on the application that I signed on June 6, 1985. I have been advised by ARM that this file was kept in the ordinary course of business and contains no information or other documents,

other than that copied and attached hereto as Exhibit "ARM".

Friedler Declaration of January 30, 1994, ¶ 5.

13. Attorneys and agents who practice before the PTO are governed by the "Patent and Trademark Office Code of Professional Responsibility." It is a violation of the Code to "[k]nowingly [give] false or misleading information or knowingly [participate] in a material way in giving false or misleading information to the Office or any employee of the Office." 37 C.F.R. § 10.23(c)(2). The reexamination requests were signed by EPI's President Michael S. Gurnicz, who does not appear to have been admitted to practice before the PTO.

appears to be no legal requirement that it do so.

However, the court cannot condone the defendants' conduct during reexamination. It is in the public interest that all parties involved in a reexamination make all information in their possession that is material to patentability available to the PTO.

A patent by its very nature is affected with a public interest. The public interest is best served, and the reexamination occurs when, at the time of reexamination proceeding is being conducted, the Office is aware of and evaluates the teachings of all information material to patentability in a reexamination proceeding.

37 C.F.R. § 1.555(a).

Failure of a reexamination requestor who is not the patent owner to comply with the duty of candor and good faith can be especially detrimental to the patent system. When a patent owner fails to exercise candor and good faith during a reexamination proceeding, this fact will almost inevitably be brought out during later litigation. However, when a reexamination requester other than the patent owner fails to exercise candor and good faith during a reexamination proceeding, the fact might never be discovered. If, by withholding material information, the requestor is successful in having the claims of its opponent's patent canceled, any pending litigation would be dismissed. The patent owner would not have an opportunity to discover the withheld information in subsequent litigation.

### 8. Conclusions

Defendants bear the burden of establishing inequitable conduct by offering "clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of the prior art and its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO." *Molins,* 48 F.3d at 1178 (Fed.Cir. 1995). The court finds that the defendants have failed. The admissibility of the Bigbee steel document has not been established. They have not established that admissions of on-sale activity were made. They have not shown that the allegedly withheld informa-

tion was material to reexamination. Intent to mislead the PTO has not been demonstrated. They have failed to establish that the information allegedly withheld during reexamination of the '509 patent was, if fact, withheld.

The court finds that during the reexamination proceedings the defendant knowingly withheld material information from the PTO with an intent to deceive.

### C. Claims Added During Reexamination

### 1. Assignor Estoppel with Respect to the Claims Added During Reexamination

TCI has asserted twenty claims, ten of which were added during reexamination. The defendants assert that some of the claims added during reexamination are invalid because they violate 35 U.S.C. § 305. TCI argues that, in addition to preventing the defendant from attacking the validity of the original claims, assignor estoppel also prevents the defendant from attacking the validity of the claims added during reexamination.

■■■ 35 U.S.C. § 305, entitled "Conduct of Reexamination Proceedings," states in relevant part that

[i]n any reexamination proceeding under this chapter, the patent owner will be permitted to propose any amendment to his patent and a new claim or claims thereto, in order to distinguish the invention as claimed from the prior art cited under the provisions of section 301 of this title, or in response to a decision adverse to the patentability of a claim of a patent. No proposed amendment or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding under this chapter.

35 U.S.C. § 305. Amendment of claims during reexamination "must be seen in light of the fundamental purpose of reexamination—the determination of validity in light of a substantial new question of patentability." *In re Freeman,* 30 F.3d 1459, 1468 (Fed.Cir. 1994). Unlike litigation, reexamination affords the patent owner a chance to narrow the scope of its claims to avoid subsequently discovered prior art. *Id.* However, the

statute prevents the patent owner from expanding the scope of the claims to include disclosed but previously unclaimed subject matter. Only reissue affords the patent owner an opportunity to expand the scope of its claims. 35 U.S.C. § 251. A claim that violates 35 U.S.C. § 305 is invalid. *Quantum Corp. v. Rodime PLC*, 851 F.Supp. 1382, 1389 (D.Minn.1994).

■■■ Assignor estoppel prevents an assignor from attacking the validity of the patent.

Assignor estoppel is an equitable doctrine that prevents one who has assigned rights to a patent (or a patent application) from later contending that what was assigned is a nullity. The estoppel also operates to bar other parties in privity with the assignor, such as a corporation founded by the assigner. The estoppel historically has applied to invalidity challenges based on "novelty, utility, patentable invention, anticipatory matter, and state of the art."

*Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed.Cir.1988) (internal citation omitted). The doctrine prevents an injustice to the assignee.

[I]t is the implicit representation by the assignor that the patent rights he is assigning (presumably for value) are not worthless that sets the assignor apart from the rest of the world and can deprive him of the ability to challenge the validity of the patent. To allow the assignor to make that representation at the time of the assignment (to his advantage) and later repudiate it (again to his advantage) could work an injustice against the assignee.

*Id.* "[T]he primary consideration in now applying the doctrine is the measure of unfairness and injustice that would be suffered by the assignee if the assignor were allowed to raise the defenses of patent invalidity." *Id.* at 1225.

TCI, the assignee, alone is responsible for the claims added during reexamination. Mr. Webb assigned the application that eventually led to the '408 and '509 patents on March 9, 1990, well before the original patents issued; there is no evidence that he was involved in the prosecution after that date. In assigning the application to TCI, he made no representation that claims added during reexamination did not violate 35 U.S.C. § 305. Nor is he responsible for any of the actions taken during reexamination. He was not the patent owner during this period, and there is no evidence that he was involved in the prosecution that led to the added claims.

In asserting that the claims added during reexamination violate 35 U.S.C. § 305, Mr. Webb is not "contending that what he assigned is a nullity." He is not contradicting his declaration that he believed that he was the original, first, and sole inventor of the subject matter claimed in the application that he assigned to TCI. The claims carried over from the original patent are not being challenged. Only the claims added during reexamination are being challenged, and they are being challenged on a limited basis: violation of 35 U.S.C. § 305. No challenge on the basis of novelty, utility, patentable invention, anticipatory matter, or state of the art is being made; these issues do not enter into the inquiry.

■■■ The only thing that the assignee can lose are claims, obtained by its own actions, that violate 35 U.S.C. § 305. Allowing the defendant to challenge these claims on this limited basis would not be unfair or "an injustice to the assignee." I conclude that, when claims have been added or amended during a reexamination carried out after the patent or the patent application has been assigned, and when the assignor was not involved in obtaining the added or amended claims, assignor estoppel does not prevent the assignor from asserting that the claims added or amended during reexamination violate 35 U.S.C. § 305.

### 2. The Asserted Claims

**The '408 Patent**

TCI has asserted claims 3, 5, 6, and 8–19 of the '408 patent. Claims 3, 5, 9, 17, 18, and 19 are independent claims. Claims 6 and 8 depend on claim 5. Claims 10–16 are dependent, directly or indirectly, upon claim 9. Claim 3 reads as follows:

A sump-riser apparatus for a pipeline system including a sump housed within

said sump-riser apparatus, said apparatus comprising:

 a) a hollow sump base including side walls and an upper surface having an opening therein;

 b) a generally cylindrical riser extension removable mounted on the upper surface of said sump base in surrounding relationship thereto and including side walls, a lower opening in communication with said opening in said sump base, and an upper opening;

 c) an access cover, mounted on the top of said riser extension over said upper opening and including an aperture therein, for enabling access to the interior of said sump apparatus;

 d) an access lid, mounted on said access cover over said aperture in said cover, for permitting observation of the interior of said sump apparatus;

 e) the outer surface of the side walls of said riser extension include [sic] score lines therein for assisting in sizing the riser portion.

Claim 5, with bracketed material and paragraphing added, reads as follows:

A sump-riser apparatus for a pipeline system, said apparatus comprising[:]

 [a) ] a hollow sump base including an upstanding annular portion disposed on an upper surface thereof in surrounding relationship to an opening formed in said surface;

 [b) ] a hollow detachable riser extension mounted on said sump base that, when said riser extension is inverted, said riser extension is receivable within said sump base;

 [c) ] and a cover for said riser extension;

said riser extension including an annular step portion at the base thereof which fits over and around said standing annular portion of said sump base and which is of a size and shape relative to said cover to enable receipt thereof of said cover.

Claim 9, with bracketed material added, reads as follows:

A sump-riser apparatus for a pipeline system, said apparatus comprising:

 [a) ] a hollow sump base including side walls and an upper annular wall portion extending inwardly from the top of said side walls to define an upper surface having a central opening therein;

 [b) ] a generally cylindrical riser extension removably mounted on the upper surface defined by the upper wall portion of said sump base in surrounding relationship to said central opening in said upper wall portion and including side walls, a lower opening in communication with said central opening and an upper opening;

 [c) ] an access cover, mounted on the top of said extension riser over said upper opening and including an aperture therein, for enabling access to the interior of said sump-riser apparatus; and

 [d) ] an access lid, mounted on said access cover over said aperture in said cover, for permitting observation of the interior of said sump apparatus.

Claim 17 is identical to claim 9 except that it also recites that the access lid is adapted to be positioned below a manhole cover. Claim 18 is identical to claim 9 except that it also recites that the upper surface and the side walls of the sump base are formed from one piece. Claim 19 is identical to claim 9 except that "exterior surface" is used in place of "upper surface" in a) and b).

### The '509 Patent

 TCI has asserted claims 1, 7, 11, 16, and 19 of the '509 patent. Claim 1 of the '509 patent was canceled during reexamination. This court has ruled that the doctrine of assignor estoppel does not apply to claims canceled during reexamination proceedings because an equitable doctrine may not circumvent the operation of a statute. *Total Containment Inc. v. Environ Products Inc.*, 34 U.S.P.Q.2d 1254, 1995 WL 91433 (E.D.Pa.1995). Claim 1 is without legal effect and cannot be asserted in this action.

In the reexamined patent, claims 7, 11, 16, and 19 are independent claims. Claim 7, as rewritten in independent form following cancellation of claim 1, reads as follows:

A sump-riser apparatus for connection to a fluid storage tank in a pipeline system, said sump-riser apparatus comprising:

a) a hollow sump base having a bottom end and a top end including at least one side wall forming a substantially tubular housing extending between said bottom end and said top end;

b) a generally tubular hollow riser section located at the top end of said sump base and extending therefrom and having a hollow interior;

c) said riser section being generally smaller in width than said sump base;

d) a cover mounted over said riser section and having means for accessing the interior of said riser section and said hollow sump base;

e) said sump base including an opening in said at least one said side wall so that a conduit may inserted through said opening;

f) said hollow riser section includes a plurality of score lines.

Claim 11 is identical to claim 7 except that the term "score lines" in f) has been replaced by the term "cutting guides." Claim 16 is identical to claim 7 except for f), which reads:

f) said riser section and sump base are separate pieces, said riser section is of a size and shape relative to said sump base such that when inverted a major portion of said riser section nests in said sump base, said riser section includes an annular step portion at the base thereof, which is of a size and shape relative to said cover to enable receipt therewithin of said cover.

Claim 19 is identical to claim 7 except for:

f) one of said sump base and said riser section having a plurality of panels; and

g) one of said sump base and said riser section including a plurality of cutting guides.

### 3. Analysis of the Added Claims Under 35 U.S.C. § 305

35 U.S.C. § 305 imposes two restrictions on amendments and new claims proposed during reexamination: (1) they cannot enlarge the scope of the claims of the patent, and (2) they must either distinguish the invention as claimed from the prior art cited in the reexamination request, or be in response to rejection by the PTO.

To determine whether the added claims expand the scope of the claims of the patent, each added claim is compared with the claims of the original patent to determine if "it includes within its scope any subject matter that would not have infringed the original patent." *Freeman*, 30 F.3d at 1464. A claim that is broader in any respect is considered to be broader than the original claims even though it may be narrower in other respects. *Id.*

Of the claims asserted in this action claims 13–19 of the '408 patent were added during reexamination. Claims 13–16 of the '408 patent are dependent on claim 9, an original claim. They further limit the subject matter of claim 9 and, consequently, do not expand the scope of the claims. 35 U.S.C. § 112 ¶ 4. Claim 17 contains all the limitations of claim 9 with the additional limitation that the access lid is adapted to be positioned below a manhole cover. Claim 18 is identical to claim 9 except that it also recites that the upper surface and the side walls of the sump base are formed from one piece. Because claims 17 and 18 further limit the subject matter of claim 9, they do not expand the scope of the claims.

Claim 19 of the '408 patent is identical to claim 9 except that it recites an "exterior surface" rather than an "upper surface" in clauses a) and b). Because "exterior surface" could include a surface that is not an "upper surface," this claim is broader than claim 9. Claims 1, 3, and 5, the other independent claims in the patent, also recite an "upper surface," so claim 19 is broader than these claims as well. Therefore, claim 19 is invalid because it expands the scope of the claims in violation of 35 U.S.C. § 305.

Asserted claims 11, 16, and 19 of the '509 patent were added during reexamination. Claim 7 was not amended during reexamination but was merely rewritten in independent form following cancellation of claim 1, on which it originally depended.

The '509 patent originally contained one independent claim, claim 1, and nine additional claims, dependent, directly or indirectly, on claim 1. Claim 1 is the broadest claim in the '509 patent. Claims 11, 16, and 19 each contain all the limitations of claim 1 plus one or more additional limitations. Therefore, claims 11, 16, and 19 do not expand the scope of the original claims.

■■■ Claims 11 and 19 use the term "cutting guides" rather than the term "score lines," which appeared in original claim 7. EPI argues that claims 11 and 19 are broader than the claims of the original patent because the "cutting guides" limitation is broader than the "score lines" limitation.

The "score lines" limitation did not appear in claim 1, the broadest claim in the patent. It appeared in claim 7, which was dependent on claim 1. EPI argues that for purposes of 35 U.S.C. § 305, the scope of the original claims is determined by the claim 7, not by claim 1, because the scope of claims that were canceled on reexamination cannot be considered.

■■■ Reexamination permits the patent owner to narrow the scope of the claims to avoid subsequently discovered prior art. The statute does not limit the scope of the original patent to claims whose patentability has been confirmed on reexamination.

> The patent owner [can] propose an amendment to his patent specification or claims to distinguish his invention from the prior art cited under Section 301. However, the bill would prohibit the Commissioner from granting during reexamination any amended or new claim that enlarges the scope of a claim of the original patent.

House Report No. 96–1307, 96th Cong., 2d Sess. (1980), U.S.Code Cong. & Admin.News. Added claims expand the scope of the claims of the original patent if they include within their scope "any subject matter that would not have infringed *the original patent.*" *Freeman,* 30 F.3d at 1464 (emphasis added). The scope of all the claims of the original patent must be considered, not just the scope of those whose patentability was confirmed on reexamination. The statute does not require that the proposed limitation or limitations occur in the original claims. The cutting-guides limitation can be introduced, even though it does not appear in an original claim.

Limiting the scope of the original patent to claims whose patentability has been confirmed on reexamination would severely restrict the patent owner's ability to narrow the scope of the claims to avoid after-discovered prior art. An extreme example of the effect of such a limitation is a patent whose only claim had been canceled on reexamination. If no new or amended claim could be broader than claims whose patentability had been confirmed on reexamination, the patent owner would be unable to offer any new or amended claim without violating 35 U.S.C. § 305. This result is not consistent with the purpose of reexamination, which is to allow the patent owner to narrow the scope of the claims to avoid subsequently discovered prior art.

Claims 11 and 19 are not broader than claim 1. These claims include all the limitations of claim 1. Any conceivable apparatus that would infringe either claim 11 or claim 19 would also have infringed claim 1. The cutting guides limitation narrows the scope of claim 1 to avoid subsequently discovered prior art. Therefore, claims 11 and 19 do not expand the scope of the original claims.

As the second part of the inquiry, the court must determine whether the amendments were submitted to distinguish the invention from prior art cited in the reexamination request or in response to a decision adverse to the patentability of a claim of the patent. "[A]mendment of claims during reexamination is limited to amendment in light of prior art raising a substantial new question of patentability." *Freeman,* 30 F.3d at 1468. This requires an inspection of the file histories for the patents in suit.

■■■ Initially, the PTO stated that the prior art submitted in the reexamination request did not raise a substantial new question of patentability with respect to claim 9 of the '408 patent. Reexamination File History of U.S. Patent 5,040,408 at 169. The patentability of claim 9 was confirmed. *Id.* at 181. However, in a later office action the PTO

rejected claim 9 because of newly discovered prior art. *Id.* at 328.

Claims 13–18 were submitted in the response to the office action that rejected claim 9. *Id.* at 342. Claims 13–15 were initially presented at an interview at which the rejection of claim 9 was discussed. *Id.* at 350. Although TCI's attorney did not state on the record that these claims were submitted in response to the rejection of claim 9, this fact can be inferred from the timing of their presentation and the fact that they contain all the limitations of claim 9. Therefore, claims 13–18 of the '408 patent do not violate 35 U.S.C. § 305.

▇ Claims 11 and 16 of the '509 patent were submitted in a response to an office action that rejected claim 1. Reexamination File History of U.S. Patent 5,060,509 at 231–232. In this response TCI's attorney argued that the additional limitation in each of these claims made it patentable over the prior art cited in the reexamination request. *Id.* at 239–240. Although TCI's attorney did not state on the record that these claims were submitted in response to the rejection of claim 1, this fact, as well, can be inferred from the timing of their presentation, the fact that they contain all the limitations of claim 1, and the fact that TCI's attorney argued that they were patentable over the prior are used to reject claim 1. Therefore, claims 11 and 16 of the '509 patent do not violate 35 U.S.C. § 305.

▇ Claim 19 was submitted in a later response. In presenting claim 19 to the PTO, TCI's attorney candidly admitted its purpose. "Claim 19 could not have been presented earlier, since the undersigned did not become aware of a third party sump riser unit until after receipt of the August 31, 1993, Office Action." *Id.* at 546–547.

"[I]t is [not] in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application. Any such amendment or insertion must comply with all statutes and regulations...." *Kingsdown Medical,* 863 F.2d at 874. Claim 19 does not comply with the statute. It was submitted because of a

potentially infringing apparatus, not because it distinguished the invention from prior art raising a substantial new question of patentability. It violates 35 U.S.C. § 305 and is, therefore, invalid. *Freeman,* 30 F.3d at 1468 (claim submitted during reexamination was properly rejected by the PTO when patentee's attorney admitted that the amendment had nothing to do with a substantial new question of patentability).

## D. Claim Construction

### 1. Legal Standard

▇ The parties dispute the interpretation of a number of terms in the asserted claims. The first step in a determination of infringement is to construe the meaning of the claims alleged to have been infringed. *Snellman v. Ricoh Co. Ltd.,* 862 F.2d 283, 286 (Fed.Cir.1988).

▇ Claim interpretation is a matter of law. *Markman v. Westview Instruments Inc.,* 52 F.3d 967, 970–971 (Fed.Cir.1995) (*en banc* ), *cert. granted,* —— U.S. ——, 116 S.Ct. 40, 132 L.Ed.2d 921 (1995). "To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history." *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir. 1991). In determining the proper scope of the claims, the court must first resort to the words of the claims themselves. The words of the claims will be given their ordinary and accustomed meaning unless it appears that the inventor used them differently. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759 (Fed.Cir.1984). Claims must be read in view of the specification of which they are a part. *Autogiro Co. of Am. v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 397 (1967). To construe claim language, the court should also consider the patent's prosecution history, if it is in evidence. *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1270 (Fed. Cir.1986).

▇ Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. *Markman,* 52 F.3d at 980. Extrinsic evidence is to be used for the court's under-

standing of the patent, not for the purpose of varying the terms of the claims. *U.S. Indust. Chems., Inc. v. Carbide & Carbon Chems. Corp.*, 315 U.S. 668, 678, 62 S.Ct. 839, 844, 86 L.Ed. 1105 (1942).

> A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history.... [E]xtrinsic evidence to the patent and prosecution history, such as expert testimony, cannot be relied on to change the meaning of claims when that meaning is made clear by those documents.

*Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed.Cir.1995).

## 2. Riser Section

TCI asserts that the term "riser section" in claims 7 and 11 of the '509 patent should be not be construed to require that the riser and the base be separate pieces. Claims must be read in view of the specification of which they are a part. *Autogiro*, 384 F.2d at 397. TCI has not pointed out where a one-piece sump riser and base combination ("integral sump") is either described or depicted in the '509 patent. The court has also been unable to find any description of an integral sump in the patent. Figures 3(b) and 3(c) of the patent (Figure 3) illustrate one-piece sumps, but these sumps are not illustrative of the sumps recited by either claim 7 or claim 11 because they do not have sump riser sections that are "generally smaller in width than said sump base."

The term "riser section" appears once in the specification. "As illustrated in Figs. 1 and 2, collection sump 14 includes a cover 14a, a riser section 14b and a base or body section 14c." '509 Patent, column 8, lines 3–5. (See Figure 2.) Throughout the rest of the specification the terms "extension riser" and "riser extension" are used.

Element 14b defines the term "riser section". Figure 1 clearly depicts a sump riser apparatus in which riser section 14b and base 14c are separate pieces. Figure 2 depicts the parts assembled. Nothing in the specification indicates that any meaning other than that represented by element 14b was intended. No other embodiment is described or depicted.

The advantages of the two-piece construction are described in the specification. The riser section can be inverted and nested in the base for compact shipping. *Id.* at column 16, lines 64–66, and column 17, lines 16–26. This advantage cannot be obtained with an integral sump.[14]

There is no support in the specification for a claim to an integral sump in which the riser section is generally smaller in width than the base. The only time "riser section" appears, the riser section is shown as a separate piece. The specification does not disclose, describe, or suggest an embodiment in which the riser section and the base are a single piece. The

---

**14.** During reexamination TCI's attorney appears to have argued that the two-piece construction was an improvement over the prior art, while simultaneously asserting that the claims were not limited to a two-piece construction. In an amendment dated August 4, 1993, TCI's attorney stated:

> The sump-riser as defined in Claim 1 is a significant improvement over previously known devices. More specifically, the riser as recited in Claim 1 provides assignee's sump-risers with distinct advantages not achieved or contemplated by previously known devices. A riser, as defined in claim 1, is generally smaller in width than the sump base and is generally tubular in configuration. The generally smaller width aspect enable's assignee's sumps to have a larger base to accommodate pumps and the necessary fittings associated therewith while still permitting the riser to fit in the manhole skirt. Thus, the manhole skirt pro-

vides additional protection against ground water seeping into the sump riser. Further, the generally smaller in width aspect provides assignee's sumps with the capability for nesting. Reexamination file history of the '509 patent, Amendment of Aug. 4, 1993, at 8. Following this argument was added this footnote:

> It should be noted that this advantage is present where the sump base and riser section are separate pieces. Claim 1 covers the construction of the sump base and riser section as separate pieces as well as a one piece construction.

*Id.* Because the court has determined that the specification does not support claims to a one-piece construction, it is unnecessary to determine what effect, if any, this argument has on the claims. However, it should be noted that claim 1, which TCI's attorney asserted covered a one-piece construction, was canceled on reexamination.

advantages of the two-piece construction are described. The person of ordinary skill in the art would have no reason to believe that anything other than a two-piece construction was described in the patent. The meaning of "riser section" is clear from the specification. The claim must be construed to recite a sump riser apparatus in which the riser section and the base are separate pieces.

TCI offers extrinsic evidence in the form of expert testimony to support its position that the person of ordinary skill in the art would understand that claim 11 did not require a two-piece construction for the riser section and the base. Because the meaning is clear from the specification, it is unnecessary to consider this evidence. Expert testimony cannot be relied on to change the meaning of a claim when the meaning is clear. *Southwall Technologies*, 54 F.3d at 1578.

■ TCI also argues the doctrine of claim differentiation precludes this interpretation of riser section. Claim 13, which is dependent on claim 11, recites a sump-riser apparatus in which the riser section and sump base are separate pieces. Therefore, it is impermissible to read into claim 11 the two-piece limitation, which is found in a claim dependent on it.

> There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant.

*Tandon Corp. v. U.S. Intern. Trade Com'n.*, 831 F.2d 1017, 1023 (Fed.Cir.1987). Claim differentiation is a guide to construction, not an absolute rule.

> At the same time, practice has long recognized that claims may be multiplied ... to define the metes and bounds of the invention in a variety of in different ways. Thus two claims which read differently can cover the same subject matter.... [C]laims are always interpretable in light of the specification that led to the patent.

*Id.* (internal quotations and citations omitted). *Accord North American Vaccine v. American Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994) ("While it is true that dependent claims can aid in interpreting the scope of the claims from which they depend, they are only an aid to interpretation and are not conclusive."); *Laitram v. Rexnord*, 939 F.2d 1533, 1538 (Fed.Cir.1991) ("Claim differentiation is a guide not a rigid rule."); *Lemelson v. TRW, Inc.*, 760 F.2d 1254, 1267 (Fed.Cir.1985) ("[T]he scope of each individual claim must be examined on its own merits, apart from that of other claims, even in the same patent."); *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 404 (1967) ("Claim differentiation is a guide not a rigid rule."). *See also* 4 Donald S. Chisum, *Patents* § 18.03[6] (1979) (claim differentiation serves as a guide and may not be determinative in a particular case).

■ The "riser section" limitation appeared in all the original claims. Claim 13 was added during reexamination. Claims added during reexamination are not an appropriate guide for construing the meaning of original claims and terms used in original claims. Using claim 13 to construe claim 11 would be especially inappropriate in this case, because claim 13 was added after this suit had been initiated and EPI's products were well known to the plaintiff.

Addition of claims during reexamination to change the meaning of words and expand scope of the claims is inconsistent with the purpose of reexamination, to distinguish the invention from prior art raising a substantial new question of patentability. By adding claims during reexamination, a patent owner could use the doctrine of claim differentiation to change the meaning of terms and expand the scope of the original claims. Thus, the patent owner could accomplish indirectly what 35 U.S.C. § 305 prohibits it from accomplishing directly, expanding the scope of the claims during reexamination.

■ To prevent the scope of the claims from being expanded on reexamination, the original claims and the terms used in the original claims must be construed without

reference to claims added during reexamination. Therefore, the court will not consider claim 13 in construing the meaning of the term section in claim 11.

Alternatively, if the doctrine of claim differentiation is applied, claim 13 is invalid. The statute states that "[n]o proposed amendment or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding under this chapter." 35 U.S.C. § 305. When, as above, the meaning of claim 11 is determined without reference to claim 13, the claim recites a riser and a base that are separate pieces. If claim 13 expands the scope of claim 11 to include integral sumps, claim 13 is invalid. It is a new claim that expands the scope of the claims to include embodiments that would not have infringed the original claims.

Of the two possible approaches, the court finds that the simpler and more easily applicable approach is to ignore claims added during reexamination when construing the meaning of original claims, and the terms used in original claims. In either case, however, claim 13 can have no effect on the meaning of claim 11. The court finds that the claims of the '509 patent recite a sump in which the riser and the base that are separate pieces. The court further finds that a sump in which the riser and the base are a single piece is not supported by the specification.

### 3. Cover Having Means for Accessing the Interior

■ The parties dispute the meaning of the phrase "a cover mounted over said riser and having means for accessing the interior of said riser section and said hollow sump base" in claim 7 of the '509 patent. TCI argues that a cover satisfies this limitation. EPI's position is that the cover must comprise a separate means for accessing the interior.

A means plus function clause is construed to include the corresponding structure or structures described in the specification. 35 U.S.C. § 112, ¶ 6. TCI argues that because the specification discloses that the cover is a means for accessing the interior, this element must be construed to include a cover.

■ All elements recited in a claim are material to the claim. *Unique Concepts* at 1562. TCI's argument ignores the plain language of the claim. The claim recites "a cover ... *having* means for accessing the interior," not "a cover ... *being* means for accessing the interior" or "a cover ... *providing* means for accessing the interior."

The language of the claim is clear. The word "having" in the claim clearly indicates that the cover must include something else, a means for accessing the interior. The cover cannot itself be the means for accessing the interior.

■ TCI again offers extrinsic evidence in the form of expert testimony in support of its interpretation. Several witnesses agreed with the obvious: a cover is a means for accessing the interior. This ignores the clear meaning of the claim language, that the cover have a means for accessing the interior. Expert testimony cannot be relied on to change the meaning of a claim when the meaning is clear. *Southwall Technologies,* 54 F.3d at 1578.

TCI again argues that the doctrine of claim differentiation supports its position. Claim 11 recites a cover having means for accessing the interior; claim 15, which is dependent on claim 11, recites an access lid mounted on said cover. Therefore, the argument goes, it is improper to read the access cover limitation into the "cover having means for accessing the interior" language of claim 11. Therefore, the argument continues, it is also improper to read this limitation into the same language when it is used in other claims.

Claims 11 and 15 were added during reexamination. The "cover having means for accessing the interior limitation" appears in all the original claims. Claims added during reexamination are being used to construe the meaning of language used in original claims. As discussed above, it is inappropriate to use claims added during reexamination to construe language used in original claims. Alternatively, claim 15 is invalid if it broadens the scope of the original claims. In either instance, claims 11 and 15 can have no effect

of the meaning of language used in the original claims. A cover, by itself, does not satisfy the "cover having means for accessing the interior" limitation.

The "means for accessing the interior" allows access to the interior of the sump without removing the cover of the sump. If the means for accessing the interior is absent, the cover must be removed to access the interior of the sump. A cover having means for accessing the interior is not equivalent to a cover that does not have a means for accessing the interior, because the two structures do not achieve substantially the same thing in substantially the same way. One provides access to the interior of the sump without removing the cover; the other does not. Therefore, I find that a cover that lacks a means for accessing the interior, i.e., a cover that does not comprise an access lid, and a cover than has a means of accessing the interior, i.e., a cover that comprises an access lid, are not equivalent structures.

### 4. Surrounding Relationship

■ The parties dispute the meaning of the term "surrounding relationship" in the following limitation of claim 9 of the '408 patent:

a generally cylindrical riser extension removably mounted on the upper surface defined by the upper wall portion of said sump base in *surrounding relationship* to said central opening in said upper wall portion and including side walls.

The defendants argue that "surrounding relationship" requires a coplanar relationship between the riser extension and the central opening in the upper wall portion of the sump base. A configuration, such as that shown in Figure 31 of the patent (see Figure 4), in which the lower annular lip of the riser fits over and around an upright annular flange of the base to produce a coplanar relationship between the riser extension and the opening, is required to satisfy this limitation.

TCI argues that a coplanar relationship is not required. It is not necessary for a piece of the riser to fit over and around a piece of the base. This limitation is also met when a riser merely sits on top of a base with no part of the riser fitting over and around a part of the base.

In the hearings that preceded the granting of the preliminary injunction, the court noted that

both parties' [sumps] are made of two large, pail-shaped parts, a base and a riser, which, when assembled for operation, fit together by stacking the opening of the riser on the opening of the base. *It is the seam between the top pail and the bottom pail that is at issue in this lawsuit.* The seam has interlocking lips to guide the assembly, to give the opening rigidity, and to seal the seam.

*Total Containment,* 23 U.S.P.Q.2d at 1306 (emphasis added). The court also heard testimony concerning claim 5 of the '408 patent, which recites the "surrounding relationship" limitation. On cross-examination, EPI's counsel elicited from plaintiff's expert witness, Mr. Jere Sears, that infringement could be avoided if the base were altered by machining away "the upstanding annular portion."

Q. Is it correct that if we machined away this ledge which I believe we are calling U?

A. Yes.

Q. There would be no infringement?

A. You are correct.

*Id.* at 1307.

In granting the injunction the court noted that "[a]s this testimony suggests, defendants could, with a single, relatively minor design change, if they chose, engineer around the claim." *Id.* After representing to this court through its expert witness that infringement could be avoided if the base were altered so that no part of the base extended up to form an interlocking assembly with the riser, TCI is now attempting to change its interpretation of the term "surrounding relationship" so that sumps that lack the interlocking relationship between the riser and the base are included within the scope of its claims.

■ The parties have not referred the court to any place in the specification where the term "surrounding relationship" is used

with reference to the relationship between the riser and the base. The term seems to appear only in the claims.[15] Even though the term does not appear in the specification, the court is not free to arbitrarily give it any meaning it chooses, such as the first definition that happens to appear in a dictionary. The court must still examine the specification, the drawings, and the prosecution history to determine which of these possible interpretations can be inferred from these documents. *Autogiro*, 384 F.2d at 397; *Moleculon Research*, 793 F.2d at 1270.

The real issue is whether a riser that sits on top of a base with no part of the riser fitting over and around a part of the base infringes claim 9 of the '408 patent. The application must describe the invention. 35 U.S.C. § 112, ¶ 1. As a mandatory first step in the analysis, the specification, drawings, and prosecution history must be examined to determine if the allegedly infringing embodiment is described in the specification or if the plaintiff's attorney made arguments to the PTO that are inconsistent with plaintiff's current interpretation of the claim language.

Figure 31 of the '408 and '509 patents (see Figure 31) illustrates a sump-riser apparatus, in which the riser has a lower annular lip that fits over and around an upright annular flange which extends upwardly from the upper support surface of the base. This embodiment permits compact shipping of the sump-riser apparatus. The riser can be inverted and lowered into the sump the flange of the base. The lip prevents the riser from falling into the base and also provides a receptacle for the cover which fits therein. '408 Patent, column 17, lines 17–27. This arrangement, which is depicted in Figure 32 of the patent (see Figure 32), is called "double nesting."[16] Simple insertion of the riser into the base is called "nesting."

This is the only detailed description of the sump in the specification. A riser that merely sits on the base and, consequently, is incapable of nesting, is not described in the specification.

Throughout prosecution, nesting was cited as one of the advantages of the invention.[17] During reexamination, the examiner appears to have considered that the nesting feature was an attribute of the invention. Plaintiff's counsel informed the examiner that "[t]he Examiner has correctly interpreted removably to mean that the sump base and riser are separable at the time of shipping to allow for nesting of these components." Reexami-

---

15. The word "surrounds" occurs in the specification. In Figure 32, sump-riser 180 is described as including an upstanding annular lip 200 which surrounds a central opening 202. '408 Patent, column 17, line 6–10. But an attempt to construe "surrounds" from this passage merely raises another question, the meaning of the term "opening." The meaning of "surrounds" ultimately depends on whether an opening is considered to be two-dimensional or three-dimensional.

If, as the plaintiff argues, the opening is defined by a circle in the plane of the upper surface of the riser (the plane defined by upper support surface 188), the upstanding annular lip, which surrounds this opening, extends above the opening but is not coplanar with it. A plane normal to the upper surface of the riser passing through the upstanding annular lip would not pass through the opening.

If, on the other hand, the opening is defined as the cylindrical volume of space that extends from the upper surface of the riser through the upstanding annular lip to a plane normal to the top of the upstanding annular lip, the upstanding annular lip and the opening have a coplanar relationship. A plane normal to the upper surface of the riser passing through the upstanding annular lip would also pass through the opening.

Rather than engage in a series of semantic discussions, the court finds it more reasonable to consider first whether the accused apparatus could possibly infringe the claims.

16. Figure 32 appears to contain an error. The structure resting on top of the upright annular lip of the base 186 is the riser lip or step 192, not riser extension 190. U.S. Patent 5,060,408, column 17, lines 18–26.

17. At one point in the prosecution of the '408 patent, TCI's counsel argued:

A further feature of the invention that has been ignored by the Examiner is the relevant sizing of the sump base, riser portion and cover which permits the riser portion, when inverted, to be received within the sump base and the cover to be received in the inverted riser potion, as indicated in Figure 32. This results in compact packing of the various components so that the components can simply be taped together, as shown in Figure 32, for transport.

Prosecution History of U.S. Patent 5,060,509, Amendment of November 1, 1989, at 5.

nation File History of the '408 Patent, Request for Reconsideration, November 24, 1993, at 2.

■ A patent owner may not construe claims narrowly before the PTO and broadly before the courts. *Unique Concepts v. Brown,* 939 F.2d 1558, 1562 (Fed.Cir.1991). A patent owner may not offer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification, and the prosecution history. *Southwall Technologies,* 54 F.3d at 1578. The "removably mounted" limitation occurs in claim 9. Because the patent owner both argued that the nesting feature was an advantage of the invention and also informed the examiner that "removably" meant the riser and base were separable to allow for nesting, plaintiff may not now assert that the claims include embodiments in which the base and riser are incapable of nesting. After a consideration of the specification, the drawings, and the prosecution history, the court concludes that a riser that is incapable of nesting in the base for compact shipping, does not infringe claim 9 of the '408 patent.

5. Access Cover

■ The parties dispute the meaning of the following limitation, which is common to all the claims of the '408 patent: "an access cover, mounted on the top of said riser extension over said upper opening and including an aperture therein, for enabling access to the interior of said sump apparatus." TCI argues that this limitation is met by a gasket.

Unlike the term "surrounding relationship," both "cover" and "gasket" appear in the specification. "[T]he system ... is preferably connected and sealed by rubber gaskets...." '408 Patent, column 3, lines 60–62. "[T]he connections between the various components of the secondary system ... employ a rubber compression seal or gasket...." *Id.* at column 13, lines 35–42. "[O]ther components and fittings ... use gaskets or compression seals to connect and seal the secondary system." *Id.* at column 14, lines 7–9. Figures 4(a) of the patent (Figure 6) depicts gasket 52 and gasket 56, each fitting between two stationary parts.

A gasket is generally understood to be "a pressure tight seal made of deformable material, typically rubber, plastic, or paper, fitting between two stationary parts; used in many applications to prevent the leaking of fluids...." *Academic Press Dictionary of Science and Technology* 906 (Christopher Morris, ed., 1992). The gaskets in the '408 patent, consistent with the ordinary and accustomed meaning of the term, are made of rubber, fit between two stationary parts, and are intended to seal the secondary containment system and prevent leaks.

The term "cover" is used differently in the specification. Figures 1 and 2 depict cover 14a. Figure 31 depicts cover 194. In each of these figures the cover sits on top of the riser; it is not held between two stationary parts. The sump, including the cover, "is preferably rotationally molded from a thick high density polyethylene...." *Id.* at column 8, lines 7–8. This material is used because it provides excellent strength, chemical resistance, and soil burial stability. *Id.* at column 16, lines 42–45. A sump made of rubber or any other deformable material would be unacceptable because one of the purposes of the sump is to keep excavation backfill away from the submersible pump. *Id.* at column 8, lines 13–15.

A gasket cannot function as a cover. Unlike a cover, it fits between two stationary parts and is made from a deformable material, such as rubber. A cover sits on top of the riser, rather than between two stationary parts, and cannot be made from a deformable material. It is neither the literal nor functional equivalent of a cover. The court concludes that a gasket does not satisfy the access cover limitation, either literally or under the doctrine of equivalents.

■ TCI argues that this was the interpretation advanced by defendants in the reexamination requests. First, any arguments that the defendants may have advanced during reexamination are extrinsic evidence. Extrinsic evidence cannot be relied on to change the meaning of a claim when the meaning is clear from the patent. *Southwall Technologies,* 54 F.3d at 1578. Second, this court is not aware of any doc-

trine that forever binds a reexamination requestor who is not the patent owner to a position it has taken in a reexamination request. Nor does it find good reason for the existence of such a doctrine.

■ The arguments and amendments made by the patent owner during prosecution are pertinent to claim interpretation. *Id.* They also limit the allowable equivalents under the doctrine of equivalents. *Exhibit Supply v. Ace Patents Corp.*, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942). This prevents the patent owner from construing the claims narrowly before the PTO and broadly before the courts. *Unique Concepts* at 1562, *Autogiro*, 384 F.2d at 399.

These considerations do not apply to a third-party reexamination requestor. Infringement litigation and reexamination are separate proceedings with different objectives carried out before independent tribunals. In reexamination, there is only one issue, validity in the light of newly discovered patents and printed publications. Litigation involves numerous other issues as well.

One of the objectives of reexamination is to "permit efficient resolution of questions about the validity of issued patents without recourse to expensive and lengthy infringement litigation." House Report No. 96–1307, 96th Cong., 2d Sess. (1980). Reexamination not only settles validity questions more cheaply and quickly than litigation, it conserves judicial resources as well. If arguments made in a reexamination request could limit the defenses available in a subsequent patent infringement action, a potential defendant might be reluctant to request reexamination to resolve questions of validity. Rather than limit its defenses, the requestor might decide to bypass reexamination and resolve these questions by litigation. Validity questions that should have been resolved by reexamination would be unnecessarily returned to the courts.

6. Score Lines and Cutting Guides

■ The parties dispute whether corrugations are either the same as or equivalent to score lines. The specification states that "[s]core lines, indicated at 198 and typically spaced inch [sic] apart, serve as cutting guides for height sizing." U.S. Patent 5,060,-509, column 16, lines 66–68. The step portion of TCI's riser is sized with a plurality of score lines which serve as visual guides for cutting the riser. On installation, this permits ready adjustment of the height of the riser to the depth of the installation hole.

Corrugations are not the same as score lines. Scoring requires scratching the surface of a material.[18] *See, e.g., McGraw–Hill Dictionary of Scientific and Technical Terms* 1676 (4th Ed.1989). However, corrugations provide a visual guide for cutting the riser. Because both score lines and corrugations provide a guide for cutting the riser, they have substantially the same function. Both provide a visual guide, so they function in substantially the same way. And both achieve the same result, that is, a riser that has been cut to the proper height.

The defendant has asserted that the function of score lines is substantially different from that of corrugations because score lines weaken the riser but corrugations strengthen it. No evidence was presented to support this assertion. Scratching the surface possibly could weaken the riser. The weakening, if any, could be trivial or significant, but no physical measurements were introduced to support this assertion. Consequently, no evidence relevant to a substantial difference between score lines and corrugations was presented for the court's consideration. The court finds that because there are no substantial differences between score lines and corrugations and because corrugations satisfy the *Graver Tank* function-way-result test, corrugations are the functional equivalent of score lines. *Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.*, 62 F.3d 1512, 1517 (Fed.Cir.1995) (*en banc*).

E. Analysis Under *Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.*

1. Legal Standard

In *Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 45

---

**18.** "Score," in the sense of scratching the surface, derives from the old English word "skor" meaning notch, tally, or twenty. *The Oxford* *Dictionary of English Etymology* 799 (C.T. Onions ed., 1992).

S.Ct. 117, 69 L.Ed. 316 (1924), the Supreme Court held that the assignor of a patent is estopped from asserting the invalidity of that patent based on lack of novelty or utility, or because it is anticipated by prior inventions. *Id.* at 351, 45 S.Ct. at 120. The Court also stated that in seeking to establish noninfringement (rather than invalidity) the assignor may use "the state of the art ... to construe and narrow the claims of the patent conceding [its] validity." *Id.* This rule was not disturbed by the Court's ruling in *Scott Paper v. Marcalus Mfg. Co., Inc.,* 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945) (holding that an assignor may use an expired patent to attack the validity of the patent). After an examination of these and other authorities, the court concluded that the prior art identified by the defendants, while not relevant to the question of validity, may be considered in construing the claims of the plaintiff's patents in order to determine the question of infringement. *Total Containment,* 33 U.S.P.Q.2d at 1317.

### 2. The Hofit Brochures

The defendant argues that the Hofit brochures are printed publications that anticipate the claims of the '408 and '509 patents, leaving no enforceable scope of patent protection.

 Whether a reference is a printed publication is a legal determination based on underlying fact issues. *In re Hall,* 781 F.2d 897, 899 (Fed.Cir.1986). To serve as a printed publication, a document must be generally available. *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 936 (Fed.Cir.1990). The defendants must demonstrate by clear and convincing evidence facts that establish (1) the date of publication, (2) the sufficiency of the description, and (3) the extent of the distribution. *Canron, Inc. v. Plasser American Corp.,* 474 F.Supp. 1010, 1013 (E.D.Va. 1978), *aff'd,* 609 F.2d 1075 (4th Cir.1979); *cert. denied,* 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980). A document is effective as a publication on the date when it first reaches members of the public or becomes accessible to the public. *Constant,* 848 F.2d at 1568–1569; *Carella v. Starlight Archery*

*and Pro Line Co.,* 804 F.2d 135, 139 (Fed. Cir.1986).

 The defendant has not provided clear and convincing evidence that anyone actually received any of the Hofit brochures either before October 6, 1986, or before October 1, 1987. ARM is the only organization shown to have received any of these brochures. Because ARM did not date stamp its files, the date of receipt has not been established. Because written authorization from Hofit was required before ARM would release the brochures to EPI, public accessibility of the ARM files is also in doubt. Therefore, the Hofit brochures in the ARM file do not qualify as printed publications.

The defendant also presents the Friedler deposition. Mr. Friedler was testifying from memory about events that occurred more than seven years before he was called upon to testimonially recall. No records or other documentary evidence was presented to support his testimony, possibly because all of Hofit's records prior to 1987–88 have been destroyed. As noted above, both defendant's witness Michael Nolan and defendant's patent counsel have described the difficulties of recalling events the transpired more than seven years ago. There does not appear to have been any memorable event that would have caused Mr. Friedler to remember the specifics of the distribution of any given brochure or any other reason that he would have considered it important enough to remember the details. His deposition is not clear and convincing evidence that the Hofit brochures were accessible to the public before either October 6, 1986, or before October 1, 1987. *See also Lockheed Aircraft Corp. v. United States,* 193 U.S.P.Q. 449, 454, 213 Ct.Cl. 395, 553 F.2d 69 (1977) (oral testimony of witnesses regarding past transactions is of little probative value in the absence of contemporaneous documentary or physical evidence).

Besides the absence of corroborating mnemonic documentation, whereby the mutual date of the brochures' publication could be reliably and satisfactorily reconstructed, it is well, in assessing credibility, to take stock of human nature—the way the mind works. One tends to recall, with ineradicable certainty, events which had a profound impact on

one's psyche at the time they occurred. The assassination of President Kennedy is the classic example: those who were then old enough to be aware are still today well aware where they then were. They can probably yet see the scene as clearly as if it had been fixed by photograph. In olden times, the practice was not uncommon, at the time of a conveyance of realty, to take a child to the property, beat the child with a switch, and give the hapless youth a quite specific tour of the metes and bounds. Our forebears understood that the trauma of the day would make an pronounced impression upon the child, so that the memory of that day would not soon slip away. Should some boundary dispute later arise, the former child could be requisitioned from his retirement home to give his yet-vivid, indeed, indelible recall of where those lines were drawn.

The witness, Mr. Friedler, has been called to testify as to an occurrence which is not all that memorable: when a certain brochure— announcing a particular new embodiment of a constantly evolving, repeatedly re-engineered, sump product—happened, over perhaps a half-dozen years before, to have been disseminated to the public. That is not the sort of event that tends to immutably lodge in even the most well-meaning witness's pate. Unless one, back at that time when the action in question took place, then and there had some reason to commit the timing of that event to memory, storing it away for future use, it is the sort of virtual non-event that would tend to haze over as the years passed by. Honest attempts to reconstruct that un-recent history would have a propensity to spawn evidence falling far short of the clear and convincing—the test at bar.

The PTO has twice determined that the Hofit brochures are unavailable as prior art. In its rejection of the second submission, which was accompanied by the second Friedler declaration, the PTO stated that:

> [t]he Friedler declaration (in paragraphs 3, 8, 10 and 11) establishes that HOFIT publications were widely distributed (500/year

for at least 6 years prior to the earliest priority date of the '509 patent) to the public in a non-confidential manner and without restriction and at least some of the HOFIT Publications appear to qualify as detailed data sheets, however, no specific HOFIT publication is identified with this distribution and the declaration therefore does not satisfy the sufficient distribution criteria for any of the HOFIT publications.

PX–135 at 4–5. The standard for determining unpatentability in the PTO is a preponderance of the evidence, a lesser standard than the clear and convincing evidence standard used by this court. *In re Caveney*, 761 F.2d 671, 674 (Fed.Cir.1985).

The defendant has not met its burden of establishing by clear and convincing evidence that the Hofit brochures qualify as printed publications. Therefore, the Hofit brochures cannot be used to narrow the scope of the claims.

During reexamination, the PTO confirmed that claim 9 of the '408 patent was patentable over the Hofit brochures.[19] Thus, even if the Hofit brochures were available as printed publications to narrow the scope of the claims, they would have no effect on this claim.

### 3. The Bigbee Steel Document

The court has ruled that the Bigbee Steel document is inadmissible because it lacked sufficient circumstantial guarantees of trustworthiness. Therefore, the Bigbee Steel document cannot be used to narrow the scope of the claims.

### 4. The Hancor Literature

■ Hancor, Inc., of Findley, Ohio, produced product literature illustrating a sewage tank and an alternator valve assembly. DX 305A–E. None of this literature was before the PTO in either the initial examination or the reexamination proceedings. The Hancor "300 Gallon Sewage Tank Installation Instructions" bear the notation "Copyright 1982, Hancor, Inc." DX 305A. Mr. William

---

**19.** In the initial office action following the reexamination request, before the PTO had determined that the Hofit brochures were unavailable as a reference, the patentability of claim 9 was confirmed. A later office action rejected the claim on the basis of other newly discovered art. The claim was ultimately found to be patentable over the other newly discovered art.

Altermatt, vice-president of Marketing for Hancor, testified that a copy of these instructions had been included with each tank sold since 1982. DX 350 at 4. This instruction sheet is a printed publication within the meaning of 35 U.S.C. § 102(b).

The third page of this instruction sheet illustrates a corrugated riser and contains the following instructions.

> A Hancor riser is available to bring access to the manhole to ground surface. We suggest that the riser be used to make cleanout and inspection easier. The riser should be trimmed to proper length before placement and final backfilling.

DX 305A at 3. The other Hancor brochures also illustrate use of the corrugated riser to bring access to the manhole from the surface.

■ The Hancor literature is concerned with sewage treatment, not with secondary containment. However, a reference is pertinent to the claimed invention, even though it may be in a different field than that of the invention, if it is one which, because of the subject matter disclosed, would have been of interest to the inventor in considering the problem confronting him. *In re Clay*, 966 F.2d 656, 659 (Fed.Cir.1992).

■ Here the problem facing the inventor was one of conveniently adjusting the height of the riser. A solution from a different art area would be of interest to the inventor. I find that the Hancor literature is relevant prior art to the '408 and '509 patents.

The reissued '509 patent, which contains the newly added cutting guides limitation in asserted claims 11 and 19, issued on Sept. 20, 1994. Because I have found that claim 19 was added in violation of 35 U.S.C. § 305, only claim 16 needs to be considered. Only Environ 6 and Environ 7 have been sold since Sept. 20, 1994. As discussed below, these embodiments do not infringe claim 16 because they do not satisfy the "cover having means for accessing the interior limitation" of claim 16. Therefore, it is unnecessary to use the Hancor literature to construe claim 16 under *Westinghouse* to determine its scope.

EPI argues that Hancor also limits the equivalents to a "cover having means for accessing the interior" that TCI may claim under the doctrine of equivalents. Because I have already held that a cover without an access lid is not equivalent to a cover having means for accessing the interior, it is unnecessary to address this argument.

F. Infringement

1. The Asserted Claims

Environ sells an integral sump-riser apparatus in which the base and the riser are a single piece. There have been seven different embodiments of the EPI two-piece sump-riser apparatus. Each embodiment has been marketed in different sizes, such as deep burial and shallow burial sumps, but the features of each size were common for each embodiment. The dates of sale for each of the embodiments are:

Environ 1 1990–June 1992
Environ 2 June 1992–October 1992
Environ 3 October 1992–December 1993
Environ 4 January 1994–February 1994
Environ 5 February 1994–April 1994
Environ 6 May 1994–present
Environ 7 October 1994–present

TCI alleges that defendants contributorily infringe and induce infringement of one of more of claims 1, 7, 11, and 19 of the '509 patent through the manufacture and sale of the integral sump-riser apparatus and through the manufacture and sale of one or more the two-piece embodiments. TCI has asserted claims for contributory infringement and inducement of infringement of the '509 patent, rather than for direct infringement, because all the claims of the '509 patent recite a base that has at least one opening in the sidewall, so that a conduit may be inserted through that opening. EPI's sumps do not have this feature when sold. However, the defendants have stipulated that there is no other use for their sump base without the opening, and that their literature shows how to provide this feature.

Claims 7, 11, and 16 are the only claims of the '509 patent that need to be considered. This court has previously held that claim 1,

which was canceled on reexamination, is without legal effect and cannot be asserted in this action. *Total Containment,* 34 U.S.P.Q.2d at 1254. Claim 19 was held to be invalid because it was submitted in violation of 35 U.S.C. § 305.

Each of these claims is an independent claim. Each recites a sump-riser apparatus comprising a hollow sump base with at least one opening, a generally tubular riser section, and "a cover mounted over said riser section and having means for accessing the interior of said riser section and said hollow sump base." The only difference between them is that claim 7 also recites "score lines," claim 11 recites "cutting guides," and claim 16 recites the double nesting feature.

■ TCI asserts that the defendants directly infringe one or more of claims 3, 5, 6, and 8–19 of the '408 patent, either literally or under the doctrine of equivalents, through the manufacture and sale of one or more of the two-piece embodiments. Claim 19 was held to be invalid because it violated 35 U.S.C. § 305. Claims 3, 5, 9, 17, and 18 are independent claims. Claims 6, 8, and 10–16 are dependent claims.[20]

Claims 3, 9, 17, and 18 each recite a sump-riser apparatus comprising a sump base, a riser extension removably mounted on the sump base, an access cover with an aperture therein, and "an access lid, mounted on said access cover over said aperture in said cover, for permitting observation of the interior of said sump apparatus." Claim 5 does not recite the access lid limitation. It recites an apparatus comprising a base, a riser extension, and a cover with an interlocking seam between the riser and the base. The riser can be inverted and received in the base, and the cover can nest in the inverted riser.

The following table lists the asserted claims. Claims 1 and 19 of the '509 patent and claim 19 of the '408 patent have not been listed in the table. The claims of the '408 patent have not been asserted against the integral sump-riser (indicated by "I" in the table) because all the claims of the '408 patent recite a removable mounted or detachable sump-riser.

The '408 patent issued on August 20, 1991. The '509 patent issued on Oct. 29, 1991. The '408 reexamination certificate issued on April 19, 1994. The '509 reexamination certificate issued on Sept. 20, 1994. Because some of the claims are only enforceable from the date of the reexamination certificate, 35 U.S.C. § 307(b), and not all the embodiments were sold during the entire time period, it is not necessary that every embodiment be compared with every asserted claim.

The parties have, in general, agreed that each of the comparisons indicated by an "X" should be made. The only disagreement was whether embodiment 5 should be compared with claims 11 and 16 of the '509 patent. Embodiment 5 was sold from February, 1994, to April, 1994. Claims 11 and 16 were added on reexamination. The reexamination certificate for the '509 patent issued on September 20, 1994. Therefore, embodiment 5 does not need to be compared with claims 11 and 16 of the '509 patent.

### Environ Sump–Riser

| Claim Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | I |
|---|---|---|---|---|---|---|---|---|
| '408 Patent | | | | | | | | |
| 3 | | X | X | X | X | X | X | X |
| 5 | | X | X | X | X | X | X | X |
| 6(5) | | X | X | X | X | X | X | X |
| 8(5) | | X | X | X | X | X | X | X |

20. The court knows of no reason for asserting the numerous dependent claims that have been asserted in this action. The damages are the same whether there is infringement of one or one hundred claims. Damages are not multiplied by the number of claims infringed.

A dependent claim incorporates all the limitations of the claim on which it depends. 35 U.S.C. § 112, ¶ 4. It is not possible for an apparatus to literally infringe a dependent claim without simultaneously infringing all the claims upon which it depends. Thus, it is only necessary to compare the accused device to the independent claims to determine literal infringement. Except for hypothetical cases that are primarily of academic interest, the same is true for infringement under the doctrine of equivalents.

The usual reason for asserting both broad and narrow claims, the broad claims may be held invalid because of newly presented prior art, is not relevant here. Because of assignor estoppel, validity is not an issue in this case. Prior art can only narrow broad claims, not invalidate them. *Westinghouse,* 266 U.S. at 342, 45 S.Ct. at 117. Nothing is gained by presenting the narrower claims as well as the broad claims.

| Environ Sump–Riser | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Claim Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | I |
| **'408 Patent** | | | | | | | | |
| 9 | X | X | X | X | X | X | X | |
| 10(9) | X | X | X | X | X | X | X | |
| 11(9) | X | X | X | X | X | X | X | |
| 12(9) | X | X | X | X | X | X | X | |
| *13(9) | | | | | X | X | X | |
| *14(9) | | | | | X | X | X | |
| *15(9) | | | | | X | X | X | |
| *16(9) | | | | | X | X | X | |
| *17 | | | | | X | X | X | |
| *18 | | | | | X | X | X | |
| **'509 Patent** | | | | | | | | |
| 7 | X | X | X | X | X | X | X | X |
| *11 | | | | | X | X | X | |
| *16 | | | | | X | X | X | |

\* Indicates a claim added on reexamination.
( ) Indicates a dependent claim and the independent claim on which the claim directly or indirectly depends.

## 2. Legal Standard

"[W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). The plaintiff must prove infringement by a preponderance of the evidence. *Hughes Aircraft v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983). Infringement analysis is a two-step process. "First, the meaning of the claims alleged to have been infringed must be determined. Second, the alleged infringing device must be compared to the claims to determine whether the claims cover the device, either literally or under the doctrine of equivalents." *Snellman v. Ricoh Co. Ltd.*, 862 F.2d 283, 286 (Fed.Cir.1988). "The trial judge does not have discretion to choose whether to apply the doctrine of equivalents when the record shows no literal infringement." *Hilton Davis Chemical*, 62 F.3d at 1522.

Infringement, both literal infringement and under the doctrine of equivalents, is a question of fact. *SSIH Equip. S.A. v. United States Int'l. Trade Comm'n*, 718 F.2d 365, 376 (Fed.Cir.1983). Literal infringement requires that each element of the asserted claim find literal correspondence in the accused device. *Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255, 257 (Fed.Cir.1985); *Becton Dickinson & Co. v. C.R. Bard*, 922 F.2d 792, 796 (Fed.Cir.1990).

Infringement may be found under the doctrine of equivalents if an accused product performs substantially the same function, in substantially the same way, to obtain substantially the same result as the claimed invention. *Graver Tank v. Linde Air Products*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). "[A] finding of infringement under the doctrine of equivalents requires proof of insubstantial differences between the claimed and accused products or processes. Often the function-way-result test will suffice to show the extent of the differences." *Hilton Davis Chemical*, 62 F.3d at 1521–22. Only if an accused product contains specific structure which meets all limitations directed to structure, at least equivalently, can that product infringe under the doctrine of equivalents. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935 (Fed.Cir.1987) (*en banc*), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). Even if this test is met, however, there can be no infringement if the asserted scope of equivalents would encompass the prior art. *Id.* at 934. The burden is on the patent owner to prove that the range of equivalents that it seeks would not ensnare the prior art. *Wilson Sporting Goods v. David Geoffrey and Assoc.*, 904 F.2d 677, 685 (Fed.Cir.1990).

## 3. The Accused Embodiments

### The Integral Sump–Riser Apparatus

The integral sump-riser apparatus comprises a hollow sump base portion with panelled side walls and a corrugated riser portion extending from the top of base portion. The riser portion is generally smaller in diameter than the base. An access cover is mounted on the riser. There is no aperture in the access cover, and no access lid or observation lid mounted on the access cover.

TCI alleges that the integral sump-riser apparatus literally infringes claim 16 of the '509 patent and infringes claim 7 of the '509 patent, either literally or under the doctrine of equivalents. Neither claim 7 nor claim 11 recites that the base and the riser are a single piece. The court has determined that these claims must be construed to recite

a two-piece construction because a one-piece construction is not supported by the specification. Therefore, the integral sump-riser apparatus does not literally infringe either of these claims.

The riser of the integral sump-riser apparatus cannot be detached from the base and nested in the base to permit compact shipment. Because this is an important advantage of the claimed sump-riser apparatus, the integral sump-riser apparatus does not achieve substantially the same result as the claimed apparatus. Therefore, the integral sump-riser apparatus does not infringe claim 7 under the doctrine of equivalents.

### Environ 1

Environs 1–7 each comprised a base, a riser, and an access cover. Environ 1 comprised a hollow sump base having an upstanding annular portion on the upper surface of the base; a riser with a diameter generally smaller than that of the base, having a step portion at the bottom that fitted over and around the upstanding annular portion of the base; and an access cover with access lids. The base, riser, and lid were capable of double nesting.

TCI alleges that Environ 1 literally infringes claims 5, 6, 9, 10, and 11 of the '408 patent and infringes claims 3, 8, and 12 of the '408 patent and claim 7 of the '509 patent either literally or under the doctrine of equivalents.

Environ 1 was being sold by EPI at the time this lawsuit was initiated. On May 15, 1992, this court found that the plaintiff was likely to succeed in proving literal infringement and granted the plaintiff's motion for a preliminary injunction. *Total Containment,* 23 U.S.P.Q.2d at 1306–1307. The court stated that "[i]t is the seam between the [riser] and the [base] that is at issue in this lawsuit" and noted that the interlocking construction used by the defendants appeared to literally infringe claim 5 of the '408 patent. *Id.*

In their post-trial brief, the defendants have not denied infringement by Environ 1. The court finds that Environ 1 literally infringes claim 5 of the '408 patent. Comparison of Environ 1 with the other asserted claims is unnecessary.

### Environ 2

TCI alleges that Environ 2 literally infringes claim 9 of the '408 patent and infringes claim 3 of the '408 patent and claim 7 of the '509 patent either literally or under the doctrine of equivalents.

Environ 2 was developed in response to the preliminary injunction issued by this court on May 15, 1992. Until a complete product redesign could be effected, Environ 2 was produced from the same molds as Environ 1. In response to the testimony of TCI's expert witness, the upstanding annular portion of the base was machined off to avoid infringement of claim 5. Except for the fact that the base lacks the upstanding portion on the upper surface of the base, Environ 2 is otherwise identical to Environ 1.

Environ 2 comprises a hollow base with panelled side walls and upper surface extending inwardly from the side walls; a riser section with a diameter generally smaller than that of the base, having a step portion at the bottom; an access cover mounted on the riser, having one or more apertures in the access cover; and access lids mounted over the apertures in the access cover. The base lacks an upstanding potion on its upper surface; the bottom flange of the step portion of the riser mounts flush against the upper surface of the base. The step portion of the riser has a plurality of corrugations. The step portion of the riser is of a size to enable the access cover to nest within it. A gasket is mounted on top of the sump riser.

As noted above, TCI's expert witness testified at the hearing for the preliminary injunction that removal of the upstanding annular portion of the base would avoid infringement of claim 5 of the '408 patent. *Id.* at 1307. After representing to this court that infringement could be avoided by making this modification, now, more than two years later, TCI not only asserts that the this embodiment infringes, but that infringement was willful.

Claims 3 and 9 of the '408 patent recite the "surrounding relationship" limitation. The court has found that "surrounding relationship" requires an interlocking construction, which is not present in Environ 2 because

the upstanding annular portion of the base has been removed. The court finds that Environ 2 does not literally infringe either claim 3 or claim 9 of the '408 patent.

In granting the preliminary injunction, the court noted that "the seam has interlocking lips to guide the assembly, to give the opening rigidity, and to seal the seam." *Id.* at 1307–1308. Environ 2, which lacks one of the interlocking lips, does not contain an equivalent structure that produces these results. Therefore, the court finds that Environ 2 does not infringe either claim 3 or claim 9 of the '408 patent under the doctrine of equivalents.

Claim 7 recites a riser that includes a plurality of score lines which serve as cutting guides. The riser of Environ 2 does not have score lines. Therefore, Environ 2 does not literally infringe claim 7 of the '509 patent.

The riser of Environ 2 has a plurality of corrugations which serve as cutting guides. The court has determined that score lines and corrugations are equivalent structures. However, the court has also determined that the use of corrugations as cutting guides is in the prior art. There can be no infringement if the asserted scope of equivalents would encompass the prior art. *Pennwalt,* 833 F.2d at 934. Therefore, Environ 2 does not infringe claim 7 of the '509 patent under the doctrine of equivalents.

### Environ 3

TCI alleges that Environ 3 literally infringes claim 9 of the '408 patent and infringes claim 3 of the '408 patent and claim 7 of the '509 patent either literally or under the doctrine of equivalents.

Environ 3 was the result of a product redesign following the preliminary injunction. The access cover has an upwardly projecting frustoconical shape. The cover has neither an aperture therein nor an access or observation lid mounted on the cover. The base lacks an upstanding potion on the upper surface of the base. A gasket is mounted on top of the sump riser. The step portion of the riser has a plurality of corrugations. The step portion of the riser is not of a size to enable the access cover to nest within it.

Claim 9 of the '408 patent recites the "surrounding relationship" limitation as well as an access cover with an aperture therein and access lid mounted on the access cover "over said aperture in said cover, for permitting observation of the interior of said sump apparatus." The cover of Environ 3 lacks both the aperture and the access lid.

TCI argues that the gasket satisfies the access cover limitation, and that the cover satisfies the access lid limitation. I have determined that a gasket does not satisfy the access cover limitation, either literally or under the doctrine of equivalents. Environ 3 does not literally infringe claim 9 of the '408 patent, because the access cover with an aperture therein and access lid mounted on the access cover limitations are not met by the gasket and access cover.

The court has also determined that a cover without an access lid is not equivalent to a cover with an access lid. Environ 3 does not infringe claim 9 of the '408 patent under the doctrine of equivalents because the access cover with an aperture therein and access lid mounted on the access cover limitations are not met by an equivalent structure. Neither the gasket plus access cover nor the access cover by itself is equivalent to a cover with an access lid.

Claim 3 of the '408 patent also recites the "surrounding relationship" as well as an access cover with an aperture therein and access lid mounted on the access cover limitations. For the reasons given above, Environ 3 does not infringe claim 3 of the '408 patent either literally or under the doctrine of equivalents, because the access cover with an aperture therein and access lid mounted on the access cover limitations are not met, either literally, or by an equivalent structure.

Claim 7 of the '509 patent recites a "cover having means for accessing the interior of said riser section and said hollow sump base." Because I have determined that a cover, by itself, does not satisfy this limitation, Environ 3 does not literally infringe claim 7 of the '408 patent. I have also determined that a cover is not equivalent to a cover having means for accessing the interior. Therefore, Environ 3 does not infringe

claim 7 of the '509 patent under the doctrine of equivalents.

**Environ 4**

 TCI alleges that Environ 4 literally infringes claim 9 of the '408 patent, infringes claim 3 of the '408 patent and claim 7 of the '509 patent either literally or under the doctrine of equivalents, and infringes claims 5, 6, 8, 10, 11, and 12 of the '408 patent under the doctrine of equivalents.

The access cover of Environ 4 has an upwardly projecting frustoconical shape. The cover has neither an aperture therein nor an access or observation lid mounted on the cover. The base lacks an upstanding potion on the upper surface of the base. A gasket is mounted on top of the riser. The step portion of the riser has a plurality of corrugations.

The cover did not nest within the step portion of the riser. Although the step portion of the riser did not accept the cover, it was large enough that the cover passed through the step portion into the riser body. This precludes fitting the cover into the step portion and securing the base, riser and, cover together with heat shrink tape as illustrated in Figure 32 of the '408 patent.

Environ 4 differs from all the other embodiments in one important respect. The riser comprises a "depending annular flange" on the bottom of the riser. The "depending annular flange" is an inwardly turned flange, which has a downwardly depending lip. The lip projects into a central opening in the base. A layperson might describe it as a "tongue-and-groove" arrangement. TCI contends that, although this flange does not literally satisfy the "annular step portion" of claim 5 of the '408 patent, it is its full functional equivalent.

Both claim 3 and claim 9 of the '408 patent recite an access cover with an aperture therein and access lid mounted on the access cover. For the reasons given above, Environ 4 does not infringe either claim 3 or claim 9 of the '408 patent, either literally, or under the doctrine of equivalents, because the access-cover-with-an-aperture-therein and access-lid-mounted-on the-access-cover limitation is not met, either literally or under the doctrine of equivalents, either by a gasket and an access cover or by a cover without access lids. Claims 10, 11, and 12, dependent, directly or indirectly on claim 9, also contain the access lid limitation. 35 U.S.C. § 112 ¶ 4.[21] Because Environ 4 does not infringe claim 9 of the '408 patent, either directly or under the doctrine of equivalents, neither is there infringement of claim 10, 11, or 12. Claim 7 of the '509 patent recites the cover having means for accessing the interior limitation. For the reasons discussed above, this limitation is not met, either literally or under the doctrine of equivalents, by a cover without access lids. Environ 4 does not infringe claim 7 of the '509 patent either literally or under the doctrine of equivalents.

Claim 5 of the '408 patent has neither the cover-having-means-for-accessing-the-interior limitation nor the cutting-guides limitation. The question, therefore, is whether defendant's "depending annular flange" is equivalent to the "annular step portion" recited in claim 5.

TCI contends that this flange is the full functional equivalent of "annular step portion" because it serves to guide the assembly, to give the opening rigidity, and to seal the seam. However, claim 5 recites that the annular step portion "is of a size and shape relative to said cover to enable receipt thereof of said cover." As noted above, the cover of Environ 4 did not rest in inverted riser section. Therefore, the flange is not the full functional equivalent of the annular step portion recited in claim 5. Environ 4 does not infringe claim 5 of the '408 patent under the doctrine of equivalents.

**Environ 5**

TCI alleges that Environ 5 literally infringes claims 9, 13, 14, 15, 16, 17, and 18 of

---

21. A dependent claim contains all the limitations of the claim on which it depends. 35 U.S.C. § 112 ¶ 4 states in relevant part that:

a claim in dependent form shall contain a reference to the claim on which it depends and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

35 U.S.C. § 112 ¶ 4.

the '408 patent and that it infringes claim 3 of the '408 patent and claim 7 of the '509 patent, either literally, or under the doctrine of equivalents.

Environ 5 is identical to Environ 3. The access cover has an upwardly projecting frustoconical shape. The cover has neither an aperture therein nor an access or observation lid mounted on the cover. The base lacks an upstanding potion on the upper surface of the base. A gasket is mounted on top of the sump riser. The step portion of the riser has a plurality of corrugations. The step portion of the riser is not of a size to enable the access cover to nest within it.

Environ 5, like Environ 3 and Environ 4, does not have a access lid on the cover. Therefore, for the reasons stated above, Environ 5 does not infringe, either literally or under the doctrine of equivalents, claim 3, 9, 17, or 18 of the '408 patent, because each of these claims recites the access lid limitation. Environ 5 does not infringe claims 13, 14, 15, or 16 of the '408 because each of these claims is directly dependent on claim 9 and so contains the access lid limitation.

Claim 7 of the '509 patent recites a "cover having means for accessing the interior of said riser section and said hollow sump base." For the reasons discussed above, this limitation is not met, either literally or under the doctrine of equivalents, by a cover without access lids. Environ 5 does not infringe claim 7 of the '509 patent, either literally or under the doctrine of equivalents.

### Environ 6

TCI alleges that Environ 6 literally infringes claims 9, 13, 14, 15, 16, 17, and 18 of the '408 patent and claim 11 of the '509 patent, and that it infringes claim 3 of the '408 patent and claims 7 and 16 of the '509 patent, either literally, or under the doctrine of equivalents.

Environ 6 comprises a hollow base with panelled side walls and an upper surface extending inwardly from the side walls; a riser section with a diameter generally smaller than that of the base, having a step portion at the bottom; and an access cover mounted on the riser, having a generally flat profile and raised surfaces molded in it for strength. The base lacks an upstanding potion on its upper surface: the bottom flange of the step portion of the riser mounts flush against the upper surface of the base. The cover does not have an access or observation lid mounted on the access cover over an aperture or observation opening in the cover. A gasket is mounted on top of the sump riser. The step portion of the riser has a plurality of corrugations. The step portion of the riser is not of a size to enable the access cover to nest within it. The cover does not have an access or observation lid mounted on the access cover over an aperture or observation opening in the cover. The base lacks an upstanding potion on the upper surface of the base. A gasket is mounted on top of the sump riser. The step portion of the riser has a plurality of corrugations.

Environ 6—like Environ 3, Environ 4, and Environ 5—does not have an access lid on the access cover. Therefore, for the reasons stated above, Environ 6 does not infringe, either literally or under the doctrine of equivalents, claim 3, 9, 17, or 18 of the '408 patent. Environ 6 does not infringe claim 13, 14, 15, or 16 of the '408 patent because each of these claims is directly dependent on claim 9 and so contains the access lid limitation.

Claims 7, 11, and 16 of the '509 patent each recite a "cover having means for accessing the interior of said riser section and said hollow sump base." For the reasons discussed above, this limitation is not met, either literally, or under the doctrine of equivalents, by a cover without access lids. Environ 6 does not infringe claim 7, 11, or 16 of the '509 patent, either literally, or under the doctrine of equivalents.

### Environ 7

TCI alleges that Environ 7 literally infringes claims 9, 13, 14, 15, 16, 17, and 18 of the '408 patent and claim 11 of the '509 patent, and that it infringes claim 3 of the '408 patent and claims 7 and 16 of the '509 patent, either literally, or under the doctrine of equivalents.

The only difference between Environ 6 and Environ 7 appears to be the addition of

vertical ribs to the panels of the side walls of the base to provide added strength. Environ 7 comprises a hollow base with paneled side walls and an upper surface extending inwardly from the side walls, the panels of the side walls having vertical ribs between them; a riser section with a diameter generally smaller than that of the base, having a step portion at the bottom; and an access cover mounted on the riser, having a generally flat profile and raised surfaces molded in it for strength. The base lacks an upstanding portion on its upper surface: the bottom flange of the step portion of the riser mounts flush against the upper surface of the base. The cover does not have an access or observation lid mounted on the access cover over an aperture or observation opening in the cover. A gasket is mounted on top of the sump riser. The step portion of the riser has a plurality of corrugations. The step portion of the riser is not of a size to enable the access cover to nest within it.

Environ 7—like Environs 3, 4, 5, and 6—does not have an access lid on the access cover. Therefore, for the reasons stated above, Environ 7 does not infringe, either literally, or under the doctrine of equivalents, claim 3, 9, 17, or 18 of the '408 patent, because each of these claims recites the access cover limitation. Environ 7 does not infringe claim 13, 14, 15, or 16 of the '408 patent, because each of these claims is directly dependent on claim 9, and so contains the access cover limitation.

Claims 7, 11, and 16 of the '509 patent recite a "cover having means for accessing the interior of said riser section and said hollow sump base." For the reasons discussed above, this limitation is not met, either literally or under the doctrine of equivalents, by a cover without access lids. Environ 7 does not infringe claim 7, 11, or 16 of the '509 patent either literally or under the doctrine of equivalents. Environ 7 does not infringe claim 7, 11, or 16 of the '509 patent under the doctrine of equivalents.

**4. Infringement Analysis Summary**

Integral Sump—No Infringement

Environ 1—Literally Infringes Claim 5 of the '408 Patent.

Environ 2—No infringement

Environ 3—No Infringement

Environ 4—No infringement

Environ 5—No Infringement

Environ 6—No Infringement

Environ 7—No Infringement

### G. Intervening Rights

EPI alleges that it is entitled to intervening rights under the amended and new claims of the reissued patents under 35 U.S.C. § 307(b) and 35 U.S.C. § 252, ¶ 2. TCI alleges that EPI is not entitled to intervening rights because such a defense is barred by the doctrine of equitable estoppel. Because I have held that none of the embodiments manufactured and sold by EPI after the '408 and '509 patents were reissued infringe any of the claims of the reissued patents, it is unnecessary to address this issue.

### H. Personal Liability of Defendant Michael Webb

■ TCI alleges that defendant Michael Webb is personally liable for infringement under 35 U.S.C. § 271. A corporate officer or director may be liable for the corporation's infringement on either of two theories: alter ego, and active inducement. *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 552–553 (Fed.Cir.1990).

■ Under the alter ego theory, a corporate officer may be liable for direct infringement if there is evidence to justify piercing the corporate veil.

> For [a corporate officer] to be personally liable for [the company's] infringement under section 271(a), there must be evidence to justify piercing the corporate veil ... The court, however, must start from the general rule that the corporate shield should be recognized and upheld, unless specific, unusual circumstances call for an exception. Moreover, *unless there is at least specific intent to escape liability for a specific tort the cause of justice does not require disregarding the corporate entity.*

*Id.* at 552 (emphasis added) (internal citations and quotation marks omitted).

No evidence was presented that Mr. Webb used the EPI corporate entity for his personal protection. Mr. Webb is not personally liable for direct infringement under 35 U.S.C. § 271(a).

 Under the second theory, active inducement under 37 U.S.C. § 271(b), the plaintiff must demonstrate the defendant possessed specific intent to encourage infringement.

> [C]orporate officers who actively assist with their corporation's may be personally liable for inducing infringement *regardless* of whether the circumstances are such that a court should disregard the corporate entity and pierce the corporate veil. The alleged infringer must be shown, however, to have *knowingly* induced infringement. It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement. The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringement.

*Id.* at 553 (emphasis in original) (internal citations omitted). TCI argues that Mr. Webb induced infringement because (1) he is the CEO of EPI and oversees the operations of the company, (2) he designed the cover assembly for the EPI sump, and (3) he made loans to both Aveda and Environ Products to form what is now EPI.

TCI has not met its burden of proof. None of these allegations indicate a specific intent to infringe of the part of Mr. Webb. TCI has not presented any evidence that Mr. Webb possessed specific intent to infringe TCI's patent. Mr. Webb is not personally liable for direct infringement under 35 U.S.C. § 271(a). *Id.* at 554 (holding corporate officers liable for infringement without compelling evidence of specific intent to infringe is contrary to law).

## I. Damages for Patent Infringement

### 1. Legal Standard

TCI seeks damages for infringement of the '408 and '509 patents. TCI has also asserted that defendants' infringement is willful, thus making the case exceptional within the meaning of 35 U.S.C. § 285 and entitling it to treble damages and attorneys' fees.

 Damages for patent infringement may not be less than a reasonable royalty for the use made of the invention.[22] *Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552 (Fed.Cir.1984). If the patent owner can show that it would have made the infringer's sales, lost profits may be awarded.

> When a patent owner would have made the sale of a product "but for" the infringement, the award based on his lost profits is appropriate.... [A] lost profits award requires (1) a showing that the patent owner would have made the sales but for the infringement, *i.e.,* causation existed, and (2) proper evidence of the computation of lost profits.

*King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 863 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986) (internal citations omitted). To receive lost profits, the patent owner need only show there was a reasonable probability that it would have made the infringer's sales. *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1141 (Fed.Cir.1991); *Water Technologies Corp. v. Calco Ltd.*, 850 F.2d 660, 671 (Fed. Cir.1988).

---

**22.** Damages are governed by 35 U.S.C. § 284, which states in relevant part:

 Upon finding for the claimant the court shall award the claimant damages reasonable to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

 When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.
35 U.S.C. § 284, ¶¶ 1–2.

■ Lost profits are generally awarded if the patent owner can satisfy the test enunciated in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir.1978). The patent owner must show: (1) a demand for the patented product during the period of infringing sales, (2) an absence of acceptable, non-infringing substitutes for the patented product, (3) manufacturing and marketing capabilities to satisfy the added demand of the infringer's sales, and (4) the amount of profits it would have made had it made the infringer's sales. *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1165 (Fed.Cir.1991); *Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 1427 (Fed.Cir. 1988); *Panduit*, 575 F.2d at 1156 (6th Cir. 1978).

### 2. Absence of Acceptable Non–Infringing Substitutes

■ A key factor in the *Panduit* analysis is the absence of acceptable, non-infringing substitutes. An acceptable, non-infringing substitute is one which has all the beneficial characteristics of the patented invention, and the mere existence of a competing device does not make that device an acceptable substitute. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986). The patent owner has the burden of showing that purchasers are motivated to purchase the product because of "particular features of the product available only from the patent owner and infringers." *SmithKline*, 926 F.2d at 1166. *Accord Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*, 932 F.2d 1453, 1458 (Fed.Cir.1991).

■ The patented invention contains the following features that distinguish it from other sumps: access covers, which can be placed below manhole covers; score lines, which act as cutting guides for height sizing; and double nesting, which allows for compact shipping. To demonstrate the absence on non-infringing substitutes, TCI has the burden of proving that purchasers are motivated to purchase the infringing product because these particular features. *SmithKline*, 926 F.2d at 1166.

Fiberglass, steel, and polyethylene sumps are sold in the secondary containment market. Precise market share figures for each of these types of sumps do not appear the available. However, there was general agreement that the majority of the sumps sold are made of fiberglass. Polyethylene sumps account for less than a quarter, perhaps as low as ten percent, of the total. TCI and EPI were estimated to about equally split approximately 75 to 80 percent of the polyethylene sump market about equally.

TCI claims that fiberglass sumps are not acceptable substitutes for polyethylene sumps because they lack the following advantages present in polyethylene sumps: ease of cutting, for riser trimming and cutting holes in the base to attach piping to the sump; a lighter weight, for easier handling in the field; and a lower cost. TCI's patents do not provide it with a monopoly on making, using, and selling polyethylene sumps. No claim of either the '408 or '509 patent recites a polyethylene sump. Because this feature is not part of the patented invention, TCI cannot rely on it to demonstrate there are no non-infringing substitutes.

TCI has not presented any evidence that purchasers buy their sumps because of their patented features. No evidence, for example, was presented that major oil companies specified TCI sumps in 1991 and 1992 because of these features. Despite the fact that EPI has removed the patented features from its products, TCI and EPI are thought to sell about equal numbers of polyethylene sumps. NT:6:116:18–22. TCI's damage expert estimated that TCI and EPI each sold about 20,000 sumps in 1993, after EPI's sumps had been redesigned to remove the patented features. NT:84:14–15. Major oil companies continue to specify that both TCI and EPI sumps are acceptable for their major installations even though the patented features have been removed from the EPI sumps.

I find that TCI has failed to demonstrate that there are no acceptable, non-infringing substitutes for the patented invention. Because TCI must demonstrate all four of the factors to receive lost profits, it is unneces-

sary to consider the other *Panduit* factors in this analysis. A reasonable royalty is the appropriate measure of damages.

### 3. Reasonable Royalty

 The patent law does not mandate how the court must calculate a reasonable royalty, only that it must compensate for the infringement. *TWM Mfg.*, 789 F.2d at 899. A reasonable royalty is the amount a person, desiring to manufacture, use, or sell a patented product, would be willing to pay as a royalty and yet be able to make a reasonable profit. *Trans–World Mfg.*, 750 F.2d at 1568. It is the result of a hypothetical royalty resulting from an arm's length negotiation between a willing licensor and a willing licensee. *TWM Mfg.*, 789 F.2d at 898. The court is not limited to selecting from the royalty figures urged by the parties as reasonable, but must select a figure that is supported by the record as a whole. *Radio Steel & Mfg. Co. v. MTD Products., Inc.*, 788 F.2d 1554, 1557 (Fed.Cir.1986); *SmithKline*, 926 F.2d at 1168. A comprehensive list of evidentiary factors relevant to the determination of a reasonable royalty two willing parties would negotiate is given in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.1970). The factors are: (1) royalties received from licensing the patent in suit, (2) rates paid to the licensee for use of patents comparable to the patents in suit, (3) exclusivity of the license, (4) licensor's patent licensing policy, (5) competitive relationship of the parties, (6) beneficial effect of sales of patented products on other sales, (7) duration of patent protection and the term of the license, (8) profitability of the product manufactured under the patent, (9) advantages of the patent over prior art processes or devices, (10) the nature of the patented invention and the benefits to the infringer, (11) the extent the infringer has made use of the invention, (12) customary profits in the industry, (13) the portion of the profits that are related to the patented elements of the product, (14) expert testimony, and (15) the amount a prudent licensee would have been willing to pay for a license and yet make a reasonable profit and the amount a prudent licensor would have been willing to accept. *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1121 (S.D.N.Y.1970), *modified*, 446 F.2d 295 (2d Cir.1971), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971).

 TCI maintains that 25% is a reasonable royalty, based on the following considerations. TCI and EPI are direct competitors. TCI does not license the patents in suit because TCI prefers to maintain its own exclusivity to enjoy the gross margin it makes on its own sales (45–50%). The sale of sumps promotes the sales of other high margin products.

EPI proposes 10% as a reasonable royalty, based on the following considerations. EPI's incremental profit on its sump business is 35%. The normal starting point for allocating a license royalty is one-quarter of the available profit, or 8.75%. This figure was adjusted upward to 10% to account for the fact that EPI would be licensing a direct competitor and that the sale of sumps promotes the sale of accessories.

EPI also points out that there are two licenses involving TCI. U.S. Patent 4,971,477, a patent on flexible underground pipe, was jointly owned by TCI and Exxon, giving both co-owners equal rights to exploit the invention. Exxon granted TCI exclusive rights to sell the product to the market at large in exchange for a royalty of 3% of gross sales. Recently, Buffalo Environmental Products won the rights to this invention in an interference proceeding. As part of a settlement, Buffalo and TCI negotiated an agreement whereby TCI paid Buffalo a 3% royalty.

 In assessing the probative value of a royalty rate offered by the infringer to prove a rate lower than that claimed by the patentee, the court may not uncritically accept the numerical evidence, but must consider whether special circumstances may explain why that particular rate was warranted in previous licenses. *Georgia–Pacific*, 318 F.Supp. at 1140. The terms of these licenses are not relevant to the inquiry. Neither was a license granted by TCI in an arm's length negotiation with a major competitor. The Exxon license was a license granted by Exxon to TCI. Because the patent was jointly

owned and each party had the right to exploit the patent, the situation is entirely different from one in which a party seeks to license a patent from its major competitor. Exxon was not competing with TCI in the production of secondary containment systems. Indeed, as a major producer and marketer of petroleum products, Exxon may have been more interested in making sure that secondary containment systems that satisfied the environmental regulation were available in the marketplace than in profiting from the patent. The Buffalo license was a license granted by Buffalo to TCI as part of the settlement of an interference proceeding. Settlement-induced royalty agreements are determined largely by factors that are not considered in the hypothetical royalty negotiation analysis and are, therefore, not an accurate measure of a reasonable royalty. *Rite-Hite Corp. v. Kelley Co., Inc.*, 774 F.Supp. 1514, 1535 (E.D.Wis.1991).

The court finds that EPI's modest upward adjustment of the suggested 8.75% royalty rate to 10% is inadequate to produce a reasonable royalty. "Where a hypothetical licensee would have anticipated an increase in sales of collateral unpatented items because of the patented device, the patentee should be compensated accordingly." *TWM Mfg.*, 789 F.2d at 901. TCI's damage expert testified that TCI profits on accessories were about $35/sump in 1991 and 1992. NT:7:113:8–11. Assuming an average sump price of $400 and a gross margin of 45%, TCI would make about $180 from the sale of the sump alone. Sale of accessories would increase this to $205, an increase of nearly 20%. The court finds that TCI would have demanded an additional 2% royalty (8.75% × 20%) in the license agreement to recapture some its lost profit on accessories.

When the '408 patent issued and infringement began, EPI was in a very poor bargaining position. It was producing an infringing product. Although it needed time to redesign its product and have new molds produced, it had to continue selling sumps to remain in business. TCI and EPI are direct competitors. TCI does not license its sump patents. Under these circumstances, TCI could have demanded, and received, a very high royalty for a license. Although it is difficult, if not impossible, to evaluate these factors, because TCI might have been unwilling to grant a license regardless of the royalty offered, the court finds that these factors would have added about 10% to the royalty received by TCI. Consequently, the court finds that a reasonable royalty is 21% of sales.

35 U.S.C. § 287 limits the amount of damages that the patent owner may recover.[23] The patentee may recover damages only if it has put the infringer on notice that its product is patented. Notice can be given either by marking the product or giving actual notice to the infringer. Filing an action for infringement constitutes actual notice. In the event of a failure to mark, damages can only be collected for infringement occurring after the date notice was given.

TCI has not presented any evidence that it marked its sumps prior to December 24, 1991, the date this suit filed, or that it gave notice to EPI prior to that date. Thus, EPI's first notice of TCI's patents occurred on December 24, 1991. TCI is entitled to a 21% royalty on Environ I sales after that date. TCI is also entitled to prejudgment interest from the date of the last infringement. *Paper Converting Machine Co. v. Magna–Graphics Corp.*, 745 F.2d 11 (Fed. Cir.1984).

### 4. Willful Infringement

■ If patent infringement is willful, the court may award increased damages of up to

---

**23.** 35 U.S.C. § 287 states in relevant part:

Patentees, and persons making and selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label contain-

ing a like notice. In the event of a failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a).

three times the amount found or assessed. 35 U.S.C. § 284. A finding of willful infringement requires the fact-finder to find by clear and convincing evidence that the infringer acted in wanton disregard of the patentee's rights. *American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, .1530 (Fed.Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1647, 128 L.Ed.2d 366 (1994); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed.Cir.1992).

 TCI asserts that infringement is willful because Mr. Webb, the inventor of the '408 and '509 patents, was aware of the application that led to these patents when he left TCI. TCI also asserts that, on March 9, 1990, when Mr. Webb assigned U.S. Patent Application 07/348,396 to TCI, it contained a claim identical in scope with claim 9 of the '408 patent.

TCI's assertion—that Mr. Webb knew that EPI's sump would infringe the claims of the '408 patent when it issued because he was the inventor of the '408 patent—is not supported by the evidence. Sumps constitute only a part of the disclosure of the '408 patent. What is now claim 9 was only one of several claims pending before the PTO. The application was allowed December 5, 1990, nearly eleven months after Mr. Webb left TCI. DX 270K. It issued as the '408 patent on August 20, 1991, more than nineteen months after he left TCI. There is no evidence that Mr. Webb was involved in prosecuting this application after leaving TCI.

Although Mr. Webb was the inventor, there is no evidence that he retained a copy of either the application or the proposed claims when he left TCI. Employers typically consider copies of pending patent applications to be confidential information and require employees to return them when they terminate their employment. Nor is there any evidence that TCI notified Mr. Webb of the allowed claims after the Notice of Allowance was received. Claims are frequently amended during prosecution, and it is not unusual for the PTO to deny patent protection completely. Even if Mr. Webb had retained a copy of the application or just happened to remember the exact wording of proposed claim, he still would not have known if, and with what claims, the application would eventually issue.

TCI points to EPI's alleged failure to obtain a legal opinion before beginning manufacture as evidence that infringement was willful. In 1990, when manufacture began, neither the '408 patent nor the '509 patent had issued. There is no evidence that TCI permitted Mr. Webb to retain a copy of the application and the proposed claims when he terminated his employment. There were no issued claims, or even proposed claims, to which Environ 1 could be compared when manufacture began. Under these circumstances, it would have been difficult, if not impossible, to obtain a legal opinion.

A party cannot be inferred to have willfully infringed a patent of which it had no knowledge. *Gustafson, Inc. v. Intersystems Indus. Products, Inc.*, 897 F.2d 508, 510–511 (Fed.Cir.1990). Two methods of notification are provided in 35 U.S.C. § 287. The patentee may mark the patented article by affixing the word "patent" and the patent number to the article. Alternatively, the patentee may give actual notice. TCI has not presented any evidence that it marked its sumps prior to December 24, 1991, the date this suit filed, or that it gave notice to EPI prior to that date. Thus, EPI's first notice of TCI's patents occurred on December 24, 1991.

After the suit was filed, EPI moved rapidly to redesign its product to avoid infringement. Environ 2 was introduced soon after this court issued a preliminary injunction on May 15, 1992. Despite TCI's representation, through the testimony of its expert witness, that Environ 2 was non-infringing, TCI now asserts that introduction of Environ 2 constituted willful infringement. Since the introduction of Environ 2, EPI has completely redesigned its sumps to avoid the TCI patents. I find that EPI has not acted in wanton disregard of TCI's patent rights. Infringement was not willful.

## J. Attorney Fees

 35 U.S.C. § 285 authorizes an award of attorney fees to the prevailing party in exceptional cases. "The court in exceptional cases may award reasonable attorney

fees to the prevailing party." 35 U.S.C. § 285. An award of attorney's fees should only be made in exceptional cases in which it would be grossly unjust not to award attorney fees. *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209 (Fed.Cir.1987).

In this case the defendant presented an inequitable conduct defense that was supported by neither law nor fact. It persisted in pursing this defense, and attacking the integrity of its opponent's attorneys, even after (1) it was shown the allegedly withheld information had in fact been presented to the Patent Office and (2) the Patent Office indicated that it would not consider the information in a reexamination proceeding.

Inequitable conduct is not "just another defense" to be routinely asserted in a patent infringement case. *FMC*, 835 F.2d at 1415 (" 'Inequitable conduct' is not, or should not be, a magic incantation to be asserted against every patentee.") It is an attack on the integrity of the opponent's attorney. It should not be undertaken when it is supported by neither fact nor law. Consequently, on more than one occasion, the Federal Circuit has made it clear that unsupported accusations of inequitable conduct are a negative contribution to the administration of justice and should be condemned.

> The habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds.... A patent litigant should be made to feel, therefore, that an unsupported charge of "inequitable conduct in the Patent Office" is a negative contribution to the rightful administration of justice.

*Burlington Industries, Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed.Cir.1988).

> [U]njustified accusations of inequitable conduct are offensive and unprofessional. They have been called a "plague" on the patent system. Unjustified accusations may deprive patentees of their earned property rights and impugn fellow professionals. They should be condemned.

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1182 (Fed.Cir.1995), (internal citation omitted).

In this case, the defendant has done even more than make unjustified accusations of inequitable conduct. It has engaged in the very conduct of which it accuses plaintiff. *See In re: Estate of Drummond*, 27 Chester County Reports, 506, 509, n. 3, 13 Pa.D & C 3d 190, 194–95, n. 3 (Pa.Ct.C.P.1979) (the attorney's "self-appointed role of caster of stones at other counsel would seem somewhat uncomfortable, under the circumstances".) During the reexamination proceedings it withheld material information from the Patent Office with an intent to deceive.

These circumstances are exceptional. It would be grossly unjust not to award attorney fees to the plaintiff for its response to the defendants' inequitable conduct defense. Because I have found that infringement was not willful, TCI is not entitled to the remainder of its attorney fees. TCI is not entitled to prejudgment interest on this award.

## K. Trademark Infringement

### 1. Plaintiff's Allegation

TCI is the owner of Federal Registration No. 1,631,610 for the trademark "ENVIRO-FLEX," as a trademark for "plastic and rubber pipes for conveying gasoline, diesel fuel and chemicals." The mark was first used in commerce on Nov. 11, 1988, and was registered on Jan. 15, 1991. EPI uses its corporate name, Environ, in connection with the sale of sumps and piping for secondary containment system. TCI alleges that EPI's name "Environ" infringes its "ENVIRO-FLEX" trademark in violation of § 32 of the Lanham Act (15 U.S.C. § 1114).

### 2. Legal Standard

The Lanham Act states in relevant part that

> [a]ny person who shall, without consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on

or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

 To establish trademark infringement, a plaintiff must show that: (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir.1994). Validity and legal protectability are proven when a mark is federally registered and has become "incontestable."[24] If the mark has not achieved incontestability, validity depends on proof of secondary meaning, unless the unregistered mark is inherently distinctive. *Id.*

 Secondary meaning exists where "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself." *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 292 (3d Cir.1991) *cert. denied sub nom., Altran Corp. v. Ford Motor Co.*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). Defendants do not contend that plaintiff's trademark has not acquired secondary meaning. Therefore, validity and legal protectability, the first to elements of trademark infringement have been established.

 The plaintiff must prove by a preponderance of the evidence that a likelihood of confusion exists between the accused mark and the plaintiff's mark. *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377 (8th Cir.1965). The likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. Proof of

actual confusion is not necessary, likelihood of confusion is all that need be shown. The showing of proof plaintiff must make depends on whether the goods or services offered by the trademark owner and the alleged infringer are in direct competition. Where the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself. The court focuses on the marks to determine whether they are "confusingly similar."

*Fisons*, 30 F.3d at 472–473 (internal citations omitted).

 The Third Circuit has enumerated ten factors to be considered in determining likelihood of confusion: (1) the degree of similarity between the owner's mark and the alleged infringing mark, (2) the strength of the owner's mark, (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase, (4) the length of time the defendant has used the mark without evidence of actual confusion, (5) the intent of the defendant in adopting the mark, (6) the evidence of actual confusion, (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media, (8) the extent to which the targets of the parties sales efforts are the same, (9) the relationship of the goods in the mind of the public because of the similarity of function, and (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir.1983); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978). Not all the factors need be considered when some are dispositive. *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151–52 (3d Cir.1984). "The factors are interrelated and must be considered as such when assessing the likelihood of confu-

---

**24.** A registered trademark becomes incontestable after the owner files an affidavit stating that it has been in continuous use in commerce for five consecutive years subsequent to registration, that it is still in use, and there are no pending proceedings and no adverse decision concerning the registrant's ownership or right to registration. 15 U.S.C. § 1065. "ENVIROFLEX" was registered on Jan. 15, 1991, so it has not become incontestable.

**1408**

sion." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir.1986).

3. Analysis

**The strength of the owner's mark.**

■ Suppliers commonly use "Enviro" as a prefix to suggest an environmentally protective product or service. A trademark search found more than 2,300 federally registered, published, pending, or abandoned trademarks that contain "ENVIRO" as part of the mark. DX 302A. An additional 1,290 state registered trademarks that contain "ENVIRO" were found. DX 302B. An additional 748 entries were found in the common law database. DX 302C. For example, the similar term "ENVIREX", (for consulting services), which is similar to "ENVIRO–FLEX," was registered in 1975. Telephone directories also contain numerous listings of businesses whose names begin with "Enviro," ranging from an "Envirobusiness" (consultants) in Boston to an "Environ Doctor" (allergy specialist) in Los Angeles.

International Trademark Classification 17 (rubber goods), which includes "ENVIRO–FLEX," contains twenty-four federally registered and pending trademarks that include "Enviro" as part of the mark. These include, among others, "ENVIRO–GUARD," "ENVIROFOAM," "ENVIRO–SAFE," "ENVIRO–FILL," and "ENVIROGLAS."

Both TCI and EPI belong to the Petroleum Equipment Institute, a trade association for the petroleum distribution equipment industry. This industry is made up of suppliers of equipment and services used in petroleum marketing and liquid handling operations. It includes manufacturers, sellers and installers of equipment used in service stations, bulk plants, fuel oil and gasoline delivery, and similar petroleum marketing operations. In this industry, there are, among others, "ENVIROQ" (installation and repair of underground piping systems), "ENVIRO–CARE" (double containment metal tanks), "ENVIROQUEST" (software programs for leak detection), "ENVIROPIPE" (plastic pipe), "ENVIRO–TANK" (underground storage tanks), "ENVIRO–NET" (tank management systems),

and "ENVIRO–CARE" (containment tanks). The Petroleum Equipment Directory is a directory of members and affiliates published by the Petroleum Equipment Institute. It lists the following businesses, among others, that include "Enviro" as part of the name of their business: Environmental Products & Services (distributor), Environment & Safety (leak detection systems), Environmental Protection Products (containment pans), Environmental Well Products (remediation products), Ainley Envirotech (contractor), Enviro Technology (leak detection systems), Buffalo Environmental Products (secondary containment systems), American Envirospect (leak detection services), The Envirovision Group (engineering services), Envirologic Technologies (consulting), Enviroshield (analytical services), World Enviro Systems (secondary containment systems), lastly, and Omega Environmental (leak prevention systems).

■ The strength of a trademark is its tendency to identify the goods sold under the mark as emanating from a particular source. This originating quality is undercut by significant third-party usage of similar marks. "Little Golden Books" was found to be a weak mark because of third-party registration of over 2,000 trademarks incorporating the term "Golden," 113 of which were registered in the toy, game, and paper products field. *Western Pub. Co., Inc. v. Rose Art Industries, Inc.*, 910 F.2d 57, 61 (2d Cir.1990) ("Little Golden Books," for children's books, not infringed by "Magnetic GoldenSlate," for a magnetic drawing toy). Marks incorporating elements commonly used in a particular field are weak marks. "Nutri/Systems" was held to be a weak mark because "Nutri" was commonly used as a prefix in the food and health products field. *Nutri/System, Inc. v. Con–Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir.1987) ("Nutri/Systems," for weight loss centers, not infringed by "Nutri–Trim," for weight loss counseling services). *See also Knapp–Monarch Co. v. Poloron Products, Inc.*, 134 U.S.P.Q. 412, 414 (Trademark Trial & App.Bd.1962) (no likelihood of confusion between "Thermex" for insulated picnic jugs, boxes, and containers and "Therm–a–Jug" insulated beverage containers because

"Therm" is a common term suggestive of heat).

After consideration of a question similar to the case at bar, the Trademark Trial and Appeal Board concluded that, as applied to cleaning preparations, "Enviro Chem" does not so resemble "Environ" that confusion is likely. *Chemed Corp. v. Enviro–Chem Corp.,* 185 U.S.P.Q. 243 (Trademark Trial & App. Bd.1974). The court concludes that, both because of extensive third-party use of similar marks, and because the prefix "Enviro" is commonly used by suppliers of products and services to the petroleum distribution equipment industry, "ENVIROFLEX" is a weak mark and entitled to limited protection.

**The degree of similarity between the owner's mark and the alleged infringing mark.**

 The two marks are not identical. Each mark includes "Enviro" as the first part of the mark. "ENVIROFLEX" has ten letters and four syllables. It is a combination of two commonly used word fragments, "enviro" and "flex." As discussed above, "enviro" is commonly used as a prefix to designate environmentally protective goods or services. The suffix "flex" is used by several suppliers of flexible pipe either in trademarks or as part of their corporate names. Everflex, Bufflex, Permaflex, Primaflex, Resistoflex, Teleflex, Titeflex, Super–Flex, Petroflex, and Smithflex are all used in the industry. EPI uses "GEOFLEX" on its flexible pipe.

Because each fragment is widely used in trademarks, "ENVIROFLEX" derives its trademark value from the combination of the two fragments. Neither fragment, standing alone, is capable of designating a source of goods. The mark must be viewed as an entity in determining likelihood of confusion.

"Environ" is a word of the English language, a transitive verb meaning to encircle, envelop, surround, or form a ring around.[25] *Webster's Third International Dictionary* 760 (1986). It has seven letters and three syllables. The first six letters are identical with "ENVIROFLEX." In its plural form,

"environ" is a noun meaning "surroundings." It is the root word for the noun "environment." It is also suggestive of EPI's products, secondary containment systems that surround underground piping systems.

 The test for determining the similarity of marks is whether they create the same overall impression when viewed separately. *Fisons,* 30 F.3d at 477. Although each mark begins with "Enviro," this fragment is weak because of numerous other marks in the field. A consumer viewing a mark beginning with "Enviro" and noticing only the first six letters would not immediately identify it with TCI's goods. The entire mark would have to be examined to determine which of the numerous marks that begin with this fragment was being viewed. The court concludes that the marks are not confusingly similar when viewed independently.

**The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase.**

 Secondary containment systems are not inexpensive consumer goods purchased on impulse by inattentive or unsophisticated consumers. They are capital goods purchased by knowledgeable buyers. Their purchase is driven by the purchaser's need to comply with environmental regulations. Suppliers are not haphazardly selected from the Yellow Pages.

 Polyethylene sumps, exclusive of the related piping and fittings, are sold for about $400. The related piping and fittings, which are required for a complete system, add considerably to the cost. A typical retail outlet requires several systems. These systems must comply with federal and state environmental laws requiring retail gasoline stations to have secondary containment systems. Because the systems are installed underground, repair or replacement of a defective system requires extensive excavation. Not only is excavation expensive, it can disrupt the distributor's business. Sys-

---

**25.** Environ is derived from the French word *environ* meaning surroundings. The French word is a combination of *en,* meaning in, and *viron,* meaning circuit. *Viron* is derived from the verb *virer* meaning to turn. *Virer* is also the source of the English verb to veer. *The Oxford Dictionary of English Etymology* 971 (C.T. Onions ed., 1992).

tem failure can produce fire and explosion. Environmental contamination, resulting in liability for environmental remediation as well as civil and criminal penalties, is also possible. Consequently, consumers use great care in selecting a supplier. Several large oil companies, Exxon and Marathon for example, as well as owners of smaller chains with as few as fifty service stations, specify their secondary containment systems after engineering analysis. NT 6:114:13–115:8. Where the consumers of the goods sold under the mark are sophisticated and knowledgeable buyers, and the goods are expensive and rationally purchased, these factors weigh against a finding of likelihood of confusion. *Ford Motor,* 930 F.2d at 293. Therefore, this factor weighs in the defendant's favor.

### The intent of the defendant in adopting the mark.

▮▮▮▮▮ The inference of intent to confuse is normally especially strong when, as here, the parties have had a prior relationship. *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1180 (9th Cir.1988); *Beer Nuts,* 805 F.2d at 927. However, in the Third Circuit, evidence of the defendant's intent does not relieve the plaintiff of its burden of proving likelihood of confusion by a preponderance of the evidence. *American Home Products Corp. v. Barr Laboratories, Inc.,* 834 F.2d 368, 371 (3d Cir.1987). At most, defendant's intent is a factor tending to suggest likelihood of confusion. *Id. See also Freixenet,* 731 F.2d at 151–152 (intent to imitate is irrelevant when other factors indicate there is no likelihood of confusion).

TCI cites *McCarthy on Trademarks* for the proposition that "[w]here we can perceive freedom of choice with full knowledge of the senior user's mark, we can readily read into defendant's choice of a confusingly similar mark the intent to get a free ride on the reputation of a well-known mark." J.T. McCarthy, *2 McCarthy on Trademarks and Unfair Competition,* § 23.33[3][a] (3d ed. 1992). This doctrine, sometimes called the "second-comer" doctrine, can be traced to *Lambert Pharmacal Co. v. Bolton Chemical Corp.,* 219 F. 325 (S.D.N.Y.1915), in which

Learned Hand, then a district court judge, held that the defendant's "Listogen" mark was confusingly similar to the plaintiff's "Listerine." *Id.* The doctrine holds that

[a] senior user in possession of a distinctive mark has a right not to have a second comer intentionally cause a likelihood of confusion between two marks in an attempt to exploit the reputation of the senior user's mark, since this would deprive the first user of control over its reputation and goodwill.

*Thompson Medical Co., Inc. v. Pfizer,* 753 F.2d 208, 214 (2d Cir.1985). The senior user's mark must be a well-known or famous mark.

When the senior user's mark is famous and the junior user is aware of that, a presumption of bad faith can arise from a choice of the same name because it is inferable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark.

*McCarthy,* § 23.33[2]. *See also Thompson Medical Co.,* 753 F.2d at 218 (the second-comer doctrine is invoked only when the senior user's mark is highly distinctive and there is proof of bad faith by the junior user).

With the adoption of tests for likelihood of confusion that require consideration of a number of factors, this doctrine has been incorporated into a systematic mode of analysis. Strength of the senior user's mark and the junior user's intent are only two of the ten factors that need to be considered in the Third Circuit. *Scott Paper,* 589 F.2d at 1229. Courts that now apply the second-comer test are merely emphasizing two of these factors. *Thompson Medical Co.,* 753 F.2d at 215.

▮▮▮▮ The Third Circuit has implicitly rejected the second-comer doctrine; evidence of defendant's intent does not relieve the plaintiff of its burden of proving likelihood of confusion by a preponderance of the evidence. *American Home Products Corp.,* 834 F.2d at 371. However, to complete the analysis, I will address the plaintiff's argument. TCI has not presented any evidence that "ENVIROFLEX" is a well-known or famous mark, either generally or within its industry.

The court has determined that the mark is weak because of extensive use of marks containing the fragment "Enviro" by third parties throughout the petroleum distribution equipment industry. TCI and EPI are not the first- or second-comers to "Enviro"; they are both recent comers to an already crowded field. Therefore, I find that the second-comer doctrine is not applicable to this situation.

### Evidence of actual confusion.

▬ Both TCI and EPI manufacture polyethylene sumps. Although TCI's sumps are blue and EPI's sumps are green, they are similar in appearance because they are manufactured from the same material. TCI asserts that a letter from an Exxon station operator in New Jersey to his parent company shows evidence of actual confusion by complaining of leakage problems with "Enviro-flex sumps", which were later revealed to be EPI sumps. TCI has offered no evidence, however, that the operator's confusion was caused a similarity in trademarks. The author merely states that he has "Enviro-flex sumps", even though TCI uses the mark on flexible pipe, but not on sumps. He does not say how he made this determination. Although this letter is evidence of confusion, it is not clear and convincing evidence of actual confusion between the Environ name and the "ENVIROFLEX" trademark.

TCI also offered testimony concerning one phone call. The caller requested information on how to put a fitting on a sump. When informed that TCI did not manufacture the fitting in question, the caller indicated that he thought Environ was a subsidiary of TCI. The caller did not indicate how he made this determination. This single call is also not clear and convincing evidence of actual confusion the Environ name and the "ENVIRO-FLEX" trademark.

"Even though evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion it does not follow that any type or quantum of such evidence is entitled to significant weight in the determination." *Homeowners Group Inc. v. Home Marketing Specialists Inc.*, 931 F.2d 1100, 1110 (6th Cir.1991) (one letter insufficient to establish actual confusion). These two instances were the only evidence of actual confusion offered by TCI. The court finds that TCI has not presented any clear and convincing evidence of actual confusion between the Environ name and the "ENVIROFLEX" trademark. This factor also weighs in the defendant's favor.

### The length of time the defendant has used the mark without evidence of actual confusion.

At the time of trial EPI had been in existence for about four and a half years (July 1990 to December 1994). During this time TCI and EPI were direct competitors, marketing functionally identical products to the same customers. Only two instances of confusion, neither of which is clear and convincing evidence of actual confusion between "ENVIROFLEX" and "Environ," were presented by TCI. "[T]he existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may lead to an inference that no likelihood of confusion exists." *Homeowners Group*, 931 F.2d at 1110. This factor also weighs in the defendant's favor.

### Whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media.

This factor is considered in situations in which the products are not in direct competition, but are marketed through the same channels of trade. TCI and EPI are direct competitors. They have a number of common distributors and market their products through the same channels of trade.

### The extent to which the targets of the parties sales efforts are the same.

TCI and EPI are direct competitors who market competing products to the same customers. This factor weighs in TCI's favor.

### The relationship of the goods in the mind of the public because of the similarity of function.

This factor is considered in situations in which the products are not in direct competition, but the public might consider them to

be complementary or logically related. Here the goods are already in direct competition so this factor need not be considered in the analysis.

**Other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.**

This factor is considered in situations in which the goods are not in direct competition, but the plaintiff might be expected to expand its product line to include the defendant's market. Here the goods are already in direct competition so this factor need not be considered in the analysis.

4. Conclusion

"A trademark holder cannot appropriate a generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term...." *American Cyanamid Corp. v. Connaught Laboratories, Inc.,* 800 F.2d 306, 308 (2d Cir.1986) ("HIB–IMUNE" for a vaccine not infringed by "HIb-VAX" for an identical vaccine because "hib" is generic for *Haemophilus* influenza type b diseases). *See also Flintkote Co. v. Tizer,* 266 F.2d 849, 852 (3d Cir.1959) ("Flextone" and "Flexacrome" not confusingly similar because "flex" is descriptive and not subject to exclusive appropriation for trademark purposes).

■■■ Even though TCI and EPI are direct competitors, I find that there is not the slimmest sliver of likelihood that consumers of goods and services in the petroleum distribution equipment industry would confuse defendant's name with plaintiff's trademark. Four factors are determinative. First, "ENVIROFLEX" is a weak mark because of extensive third-party use of similar marks, both generally and within the petroleum distribution equipment industry. Consumers in the industry are familiar with many suppliers whose names or trademarks include "Enviro," a descriptive prefix suggestive of environmentally friendly or protective goods or services. Because "Enviro" is a descriptive prefix, it is not subject to exclusive appropriation for trademark purposes. Second, the goods in question are purchased by sophisti-

cated and knowledgeable consumers who are familiar with the suppliers and their products. Third, TCI has not presented any clear and convincing evidence of actual confusion between the Environ name and the "ENVIROFLEX" trademark. Fourth, TCI and EPI have been in direct competition for more than four years with no evidence of actual confusion. The court finds that there is no likelihood of confusion between the Environ name and the "ENVIROFLEX" trademark.

L. Contract Counterclaim

1. The Counterclaim

Counterclaimant Michael Webb seeks money damages from TCI for its acknowledged failure to pay the final six monthly installments of $20,895.72 as set forth at Paragraph I.B. of the Settlement Agreement of March 9, 1990.

TCI alleges that Mr. Webb breached the restrictive covenant of the Settlement Agreement because Webb applied for group health insurance through Aveda in February, 1990. In the application Mr. Webb stated he was an employee of Aveda and that his employment had commenced on January 16, 1990.

2. Findings of Fact

The facts are largely undisputed. Mr. Webb was employed by TCI as President and General Manager from the early part of 1985 until January 15, 1990. During this period, Mr. Webb and TCI were parties to a series of one-year employment agreements drafted by TCI's counsel. On July 1, 1989, the last of these agreements with TCI became effective. In the event of Mr. Webb's termination, TCI was required to pay him a severance equal to his annual compensation for the immediately preceding 12 months. Payment was to be made in 12 equal monthly installments commencing on the first day of the first full month following termination. Under the terms of this agreement, all inventions made by Mr. Webb while employed by TCI became the property of TCI. The agreement also contained a restrictive covenant which provided that, for two years following termination of his employment, Mr.

Webb would not "enter the employ of any other person, partnership, or corporation engaged in the marketing, manufacture, distribution, or servicing of underground piping containment systems, and leak detection systems." DX 290.

On January 15, 1990, Michael Webb and Anthony Paladinetti, Jr., Vice–President of Operations, left TCI. The parties dispute whether these departures were voluntary or involuntary, but that fact is not relevant to the outcome.

About January 31, 1990, TCI tendered Mr. Webb a proposed settlement agreement. The proposed agreement contained a restrictive covenant that would have prohibited Mr. Webb "from engaging during any such period, directly or indirectly, as a principal, agent, or employee, in any such business in competition with TCI for goods and services sold or offered for sale by TCI." DX 291. Mr. Webb refused to sign the agreement because the restrictive covenant was broader than that contained in the employment agreement. TCI failed to make the first installment severance payment due on February 1, 1990. TCI refused to provide Mr. Webb and his family continuing health insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA") 26 U.S.C. § 4980B, except as part of the proposed settlement agreement.

On February 26, 1990, Mr. Webb signed an application for health insurance coverage with Aveda Manufacturing Company. The application listed Mr. Webb as an employee of Aveda as an "engineer." PX 142.

On March 9, 1990, Mr. Webb entered into the post-termination settlement agreement. DX 292. TCI was required to pay Mr. Webb ten monthly payments of $20,895.72 each, due on the first of each month beginning on April 1, 1990. Mr. Webb assigned all rights in United States Patent Application 07/254,-021 to TCI. The settlement agreement contained a restrictive covenant identical with that contained in the employment agreement. The covenant provided that Mr. Webb, for a period of two years

> will not enter the employ of any other person, partnership, or corporation engaged in the marketing, manufacture, distribution or servicing of underground tank containment systems, underground piping containment systems, and leak detection systems, nor will he engage during such period, as a principal, agent, or employee in any such business in competition with TCI.

*Id.*, ¶ III. The agreement also contained a mutual general release for all events occurring prior to March 9, 1990.

> The parties hereto hereby release, acquit and forever discharge each other, including agents, servants, stockholders, directors, heirs, executors, administrators, successors and assigns from *all claims,* causes of actions, demands, rights and damages whatever, *known or unknown,* which they now have or *could have had* against each other *from the beginning of time to the date of this Agreement,* excepting only those right and obligations explicitly set forth herein.

*Id.,* ¶ V (emphasis added).

On April 16, 1990, at the request of Rodney Brancher, Mr. Webb loaned Aveda $60,-000. This loan was evidenced by a written promissory note. PX 145. The line of credit established for Aveda by TCI in 1989 was retired. About May 20, 1990, TCI terminated its business relationship with Aveda. Between July 1989, when Aveda began operations, and May 1990, TCI did not have the capacity to manufacture the polyethylene sumps that it offered for sale. Aveda's only business during this period was plastic rotational molding, manufacturing tank sumps exclusively as a supplier to TCI. It did not compete with TCI in the manufacture or sale of underground tank containment systems, piping containment systems, or leak detection systems.

In May of 1990 TCI terminated Michael S. Gurnicz, its Vice–President of Marketing. On June 29, 1990, Brancher, Gurnicz, and Paladinetti advised TCI, though counsel, of the formation of Environ Products, Inc., which was to manufacture and sell tank sumps. Mr. Webb was not involved in the formation of EPI. Aveda became a supplier of polyethylene sumps to EPI.

On July 24, 1990, TCI brought suit against Aveda, Environ, Brancher, Gurnicz, Paladinetti, and Webb in the United States District Court for the Eastern District of Pennsylvania (Civil Action 90–4788) alleging, among other things, breach of contract, theft of trade secrets, infringement of U.S. Design Patent 322,970, and numerous violations of the RICO Act. Paragraph 13 of the complaint alleges that Mr. Webb agreed to and did "divert the business and funds of TCI to Aveda in exchange for an ownership interest in Aveda and other valuable items." Rescission of the settlement agreement and return of the four monthly payments was sought. DX 295.

On July 25, 1990, Mr. Webb advised TCI, through counsel, that the action constituted a breach of the mutual release provisions contained in the Settlement Agreement excusing him of any further obligation under the Agreement, including the restrictive covenant. DX 296. On July 29, 1990, Mr. Webb lent EPI $44,975.00, evidenced by two written notes. On August 1, 1990, TCI did not make the payment due under the Settlement Agreement. On August 9, 1990, TCI's counsel informed Mr. Webb's counsel, that no further settlement payments would be made for the reasons set forth in TCI's complaint. DX 323. On August 10 and August 21, 1990, Mr. Webb loaned EPI another $40,000, evidenced by written promissory notes. Some time in September, 1990, Webb became a consultant to EPI. NT 16:250:25.

On October 1, 1990, TCI brought suit against Aveda, Environ, Brancher, Gurnicz, Paladinetti, and Webb in the Chester County, Pennsylvania, Court of Common Pleas (Civil Action 90–08520) alleging, among other things, fraud and breach of contract. Rescission of the settlement agreement with Webb again was sought. DX 298.

About November 14, 1990, Aveda and TCI presented Mr. Webb with a proposal that would make him CEO and General Manager of EPI. The agreement also provided that EPI would pay any future legal costs for Mr. Webb stemming from lawsuits initiated by TCI, and that Mr. Webb would acquire 38% of the common stock of EPI. In December, 1990, Environ and Aveda merged to become what is now EPI. Mr. Webb became a major shareholder and CEO of the merged corporation.

On May 1, 1991, the federal court action was dismissed without prejudice, conditioned upon TCI's paying the defendants' attorneys' fees. *Total Containment*, 1991 WL 75192.

3. Analysis

a. Effect of Mr. Webb's Acts Prior to July 25, 1990

■ The Settlement Agreement was entered into in Pennsylvania by parties domiciled in Pennsylvania. Pennsylvania law applies to the counterclaim. *Complaint of Bankers Trust Co.*, 752 F.2d 874, 881–882 (3d Cir.1984). A settlement agreement is a contract, and is construed according to general contract principles. *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 215–216 (3d Cir.1992); *cert. denied*, 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). TCI bears the burden of establishing that Mr. Webb breached the condition precedent. *Mellon Bank v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1007 (3d Cir.1980).

■ TCI alleges that Mr. Webb breached the restrictive covenant of the Settlement Agreement because he applied for group health insurance through Aveda in February, 1990. Mr. Webb's employment agreement contained a restrictive covenant, but, in February, 1990, the restrictive covenant was no longer in effect. TCI breached the employment agreement by its failure to make the first severance payment on February 1, 1990, and by its refusal to provide Mr. Webb and his family continuing health insurance coverage, except as part of the proposed settlement agreement. In February, 1990, Mr. Webb was free to accept employment with Aveda or with anyone else in the secondary containment industry.

■ The Settlement Agreement also contained a mutual general release by which the parties released each other from all claims, known or unknown, which that could have had against each other up to the date of the agreement. This release is binding on the parties. General releases are binding in

Pennsylvania, even as to claims unknown at the time of the execution of the release if that was their intended scope. *Shlensky v. Dorsey*, 574 F.2d 131, 144 (3d Cir.1978). "Pennsylvania law is clearly that where the parties manifest an intent to settle all accounts, the release will be given full effect even as to unknown claims." *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 (3d Cir.1975).

"In Pennsylvania, the general rule of construction of releases is that the intention of the parties must govern, but the intention must be gathered from the language of the release." *Id.* at 892. The language is clear and comprehensive. The parties intended to release each other from "*all claims*, ... *known or unknown*, which they now have or *could have had* against each other...." DX 292, ¶ V (emphasis added). The court finds that TCI released Mr. Webb from liability for any and all acts that occurred before March 9, 1990. Mr. Webb's application for health insurance, which occurred before March 9, 1990, is not a breach of the Settlement Agreement. Because Mr. Webb left TCI in January of 1990, nothing that he did while president and general manager of TCI, such as arranging for TCI to loan money to Aveda or making Aveda a supplier to TCI, can constitute a breach of the Settlement Agreement.

TCI also alleges that Mr. Webb's loan of $60,000 to Aveda on April 16, 1990, was a breach of the Settlement Agreement. The covenant provided that, for a period of two years, Mr. Webb would neither act "as a principal, agent, or employee" of any business "engaged in the marketing, manufacture, distribution or servicing of underground tank containment systems, underground piping containment systems, and leak detection systems" nor serve "as a principal, agent or employee of any such business in competition with TCI."

TCI has attempted to rewrite history. At the time Mr. Webb made the loan, Aveda was a supplier to TCI, not a competitor. EPI did not exist in April, 1990. Aveda did not become a supplier to EPI until after the termination of its business relationship with TCI, in May, 1990, and the formation of EPI, in June, 1990. Further, the covenant only prevented Mr. Webb from acting as a "principal, agent, or employee," not from making business loans. The making of a business loan does not establish a fiduciary relationship between lender and borrower. *Buczek v. First Nat. Bank*, 366 Pa.Super. 551, 531 A.2d 1122, 1124 (1987); *Federal Land Bank of Baltimore v. Fetner*, 269 Pa.Super. 455, 410 A.2d 344, 348 (1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980). The court finds that Mr. Webb's loan to Aveda on April 16, 1990, did not breach the restrictive covenant.

TCI has not presented any other evidence that Mr. Webb breached the restrictive covenant. It has not demonstrated that Mr. Webb acted as a "principal, agent, or employee" of Aveda during this period. The court finds that TCI has not demonstrated that Mr. Webb breached the restrictive covenant before July 25, 1990, when it brought suit against Mr. Webb alleging breach of contract and numerous RICO violations.

b. Effect of the Suit Filed on July 24, 1990

When performance of a duty under contract is due, any nonperformance is a breach. If the breach constitutes a material failure of performance, the non-breaching party is discharged from all liability under the contract. *Oak Ridge Construction Co. v. Tolley*, 351 Pa.Super. 32, 504 A.2d 1343, 1348 (1985). To determine if a failure of performance is material, the following factors are considered:

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

b) the extent to which the injured party can be adequately compensated for that part of that benefit of which he will reasonably be deprived;

c) the extent to which the party failing to perform will suffer forfeiture;

d) the likelihood that the party filing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

*Capek v. Mendelson,* 821 F.Supp. 351, 361 (E.D.Pa.1993). *Accord Oak Ridge Construction,* 504 A.2d at 1348 (citing Restatement (Second) of Contracts § 241 (1981)). To determine if the action TCI filed against Webb constituted a material breach that relieved him of all liability under the contract, these factors will be considered.

**The extent to which the injured party will be deprived of the benefit which he reasonably expected.**

■ One of the things Mr. Webb specifically bargained for in settling with TCI was its obligation to leave him alone for every action, "known or unknown" that occurred "from the beginning of time" to March 9, 1990. In its complaint, TCI cited acts that occurred before March 9, 1990. As a result of TCI's action, Mr. Webb was deprived of a benefit that he reasonably expected under the Settlement Agreement. He was required to retain and pay counsel, interrupt his other activities, and suffer exposure to liability. This factor strongly favors a finding that the suit constituted a material breach of the Settlement Agreement.

**The extent to which the injured party can be adequately compensated for that part of that benefit of which he will reasonably be deprived.**

Mr. Webb, the injured party, can be compensated by payment of the final six monthly installments due under the Settlement Agreement, plus appropriate interest. This factor favors a finding that the suit constituted a material breach of the Settlement Agreement.

**The extent to which the party failing to perform will suffer forfeiture.**

TCI will suffer forfeiture to the extent that Mr. Webb is released of all further obligations under the restrictive covenant. TCI will also be required to pay the remaining sum it was obligated to pay under the Settlement Agreement.

When TCI filed the lawsuit against Aveda and Environ, it hoped to impede a potential competitor by entangling it in an expensive and time-consuming lawsuit. Although TCI was fully aware of the contents of the Settlement Agreement, it took a calculated risk when it breached the Agreement, named Mr. Webb as an additional defendant, and listed in its complaint acts that had occurred prior to March 9, 1990.[26] Not only would Mr. Webb be forced to fight the suit, but, by refusing to make additional installment payments, TCI could deny him the necessary funds. As part of a settlement, Mr. Webb might be forced to agree to the broader restrictive covenant.

TCI took a calculated risk and lost. The court finds that releasing Mr. Webb from the restrictive covenant is not an unreasonable forfeiture. This factor favors a finding that the suit constituted a material breach of the Settlement Agreement.

**The likelihood that the party filing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances.**

TCI's action sought to rescind the agreement and demanded return of the four payments already made. Consequently, there was little likelihood that TCI would cure its failure to perform by making the required payments. TCI's counsel confirmed this fact on August 9, 1990, when it stated that TCI would not make any further payments under the Settlement Agreement. This factor fa-

---

**26.** The complaint alleges, for example, that Defendants Webb and Paladinetti diverted the funds of TCI to Aveda by:

Directing payment to Defendant Brancher, of $4,200, on June 23, 1989, following receipt of an invoice from Defendant Brancher for "consultation services" rendered between May 15 and June 15, 1989, which payment was approved by defendant Paladinetti; ...

Diverting TCI production and assembly functions to Defendant, during the fall of 1989 ... to the detriment of TCI and to obtain additional TCI revenues for payments to Defendants Webb and Paladinetti....

DX 295, ¶ 13. These allegations refer to acts that occurred before March 9, 1990.

vors a finding that the suit constituted a material breach of the Settlement Agreement.

**The extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.**

 COBRA benefits act as a shield to prevent employers from using access to health insurance as a club to extract concessions from former employees. TCI's obligation to provide COBRA benefits was not dependent on Mr. Webb's acceptance of an unfavorable settlement agreement; it was required by law. By refusing to extend COBRA benefits to Mr. Webb pursuant to 26 U.S.C. § 4980B, TCI violated both the terms of his employment agreement and the law.

Mr. Webb's application for health insurance states that he has seven dependents and that his wife requires insulin to control a diabetic condition. PX 142. Under these circumstances, it would have been extremely difficult, if not impossible, for Mr. Webb to obtain replacement health insurance, especially on such short notice. These facts were almost certainly known to TCI when it attempted to coerce Mr. Webb into signing a settlement agreement with a broader restrictive covenant by withholding his COBRA benefits. Even if these facts were not known to TCI, its acts still constituted a violation of both the contract and the law.

Despite its promise to release Mr. Webb from liability for all acts that occurred before March 9, 1990, TCI filed an action against Mr. Webb listing among its causes of action events that occurred before March 9, 1990. In violation of both Mr. Webb's employment agreement and the law, TCI withheld Mr. Webb's COBRA benefits in an effort to impel him into signing an unfavorable settlement agreement. This court will not reward this behavior. The court finds that TCI's behavior does not comport with standards of good faith and fair dealing. This factor strongly favors a finding that the suit constituted a material breach of the Settlement Agreement.

After consideration of these five factors, I find that the suit filed against Webb on July

25, 1990, constituted a material breach of the Settlement Agreement.

c. Anticipatory Breach

 "An anticipatory breach of a contract occurs whenever there has been a definite and unconditional repudiation of a contract by one party communicated to another." *Oak Ridge Construction,* 504 A.2d at 1346; *See also* Restatement (Second) of Contracts § 250 (1981). "In order constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." *Oak Ridge Construction,* 504 A.2d at 1346. TCI's complaint specifically averred as an item of damages its previous payments to Mr. Webb of the four monthly settlement payments and sought recession of the Settlement Agreement and return of those payments. The language was sufficiently positive to be reasonably interpreted to mean that TCI had no intention of performing its remaining obligations under the Settlement Agreement. On August 9, 1990, TCI's counsel verified that no further payments would be made, for the reasons set forth in TCI's complaint. I also find that the suit filed against Webb on July 25, 1990, constituted an anticipatory breach of the Settlement Agreement.

4. Conclusion

During 1990, Aveda's only product was a sump. Mr. Webb also argues that a sump is only a component of a secondary containment system, not a complete system. *See S.I. Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1248–1249 (3d Cir.1985) (distinguishing "materials handling" from "materials handling system"). He further argues that, at best, the language of the Settlement Agreement is ambiguous as to whether component manufactures are included in the restrictive covenant and that, since the original language was drafted by TCI, ambiguities should be strictly construed against the drafter. Because I have already determined that TCI breached the settlement agreement, it is unnecessary to take these arguments further.

I find that the suit TCI filed against Mr. Webb on July 24, 1990, constituted a material

breach of the Settlement Agreement because it breached the mutual general release. It also constituted an anticipatory breach because it could be reasonably interpreted to mean that TCI would not make the installment payment due on August 1, 1990. As a result, Mr. Webb was released of all further obligations under the restrictive covenant.

TCI is obligated to pay Mr. Webb the full amount of the six unpaid installment payments, a total of $125,374.32. In addition Mr. Webb is entitled to prejudgment simple interest at 6% per annum. As of December 31, 1994, prejudgment interest amounted to $31,667.00. Interest has continued to accrue at the rate of $20.61 per day since that date. As of November 3, 1995, this amount totaled $163,368.59.

An Order follows.

FIG. 1

FIG. 2

FIG. 3(a) FIG. 3(b) FIG. 3(c)

FIG. 31

FIG. 32

FIG. 4 (a)

## ORDER

AND NOW, this 3rd day of November, 1995, having found that Defendant Environ Products, Inc., has infringed claim 5 of the Plaintiff's United .States Patent 5,040,408, it is ORDERED that judgment is entered in favor of Plaintiff Total Containment, Inc., on its claim of patent infringement. Environmental Products, Inc., shall submit to this court within thirty (30) days records relating to its sales of Environ 1 since December 24, 1991.

It is FURTHER ORDERED that Defendant Environ Products, Inc., shall pay Plaintiff Total Containment, Inc.'s attorneys fees and related costs and expenses for responding to Defendant's affirmative defense of inequitable conduct. Plaintiff shall submit to this court within thirty (30) days records relating to its attorneys fees and related costs and expenses in connection with this response.

It is FURTHER ORDERED that judgment is entered in favor of Counter-plaintiff Environ Products, Inc., and against Counter-defendant Total Containment, Inc., on its claim of breach of contract, in the amount of $163,368.59, plus the product of the number of days since November 3, 1995, and $20.21.